Redacted Version

# IN THE UNITED STATES COURT OF FEDERAL CLAIMS
**Bid Protest**

| | | |
|---|---|---|
| **POINT BLANK ENTERPRISES, INC.** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Case No. 1:23-cv-00913-DAT** |
| | ) | |
| **v.** | ) | **Judge Tapp** |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | ███████████ |
| | ) | |
| **Defendant, and** | ) | |
| | ) | |
| **ATLANTIC DIVING SUPPLY, INC.** | ) | |
| | ) | |
| **Intervenor- Defendant.** | ) | |

## INTERVENOR-DEFENDANT ATLANTIC DIVING SUPPLY, INC.'S MEMORANDUM IN RESPONSE TO PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Dated: July 7, 2023

Jamie F. Tabb
Vinson & Elkins L.L.P.
2200 Pennsylvania Avenue, NW
Suite 500 West
Washington, DC 20037
(202) 639-6773
jtabb@velaw.com
*Attorney of Record*

*Of counsel:*
Elizabeth Krabill McIntyre
Leslie Edelstein
Vinson & Elkins L.L.P.

*Attorneys for Atlantic Diving Supply, Inc.*

1

# TABLE OF CONTENTS

Page

I.    INTRODUCTION ................................................................................................ 1

II.   STATEMENT OF FACTS ................................................................................... 2

III.  ARGUMENT ....................................................................................................... 6

    A.    Point Blank Cannot Demonstrate a Substantial Likelihood of Success on the Merits in any of its Protest Grounds. .................................................. 6

        1.    Point Blank has no likelihood of succeeding on its argument that TYR has an unmitigated biased ground rules OCI. ................................... 6

        2.    Point Blank has no likelihood of succeeding on its argument that the RFI is unduly restrictive and not related to legitimate agency needs. ..................................................................................... 12

        3.    Point Blank has no likelihood of succeeding on its argument that the sole source award was based on inadequate market research. ............ 15

    B.    Point Blank Cannot Meet its Burden to Show a Likelihood That it Will Be Irreparably Harmed Absent Preliminary Injunctive Relief. .................................. 18

    C.    The Balance of Hardships Counsels Against Preliminary Injunctive Relief. ........ 22

    D.    The Public Interest Counsels Against Preliminary Injunctive Relief. ................. 24

IV.   CONCLUSION .................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AAR Mfg., Inc. v. United States*,
149 Fed. Cl. 514 (2020) ................................................................................................. 11

*ABF Freight Sys., Inc. v. United States*,
55 Fed. Cl. 392 (2003) .................................................................................................. 13

*ACI Techs., Inc. v. United States*,
162 Fed. Cl. 39 (2022) .................................................................................................. 19

*Altana Pharma AG v. Teva Pharms. USA, Inc.*,
566 F.3d 999 (Fed. Cir. 2009) ..................................................................................... 22

*Am. K-9 Detections Servs., LLC v. United States*,
155 Fed. Cl. 248 (2021) .............................................................................................. 7, 9

*Amazon Web Servs., Inc. v. United States*,
147 Fed. Cl. 146 (2020) ................................................................................................ 22

*Amazon.com, Inc. v. Barnesandnoble.com, Inc.*,
239 F.3d 1343 (Fed. Cir. 2001) .................................................................................... 22

*Amidon, Inc. v. United States*,
124 Fed. Cl. 517 (2015) ................................................................................................ 22

*Assessment & Training Sols. Consulting Corp. v. United States*,
92 Fed. Cl. 722 (2010) .................................................................................................. 17

*CACI, Inc.-Fed. v. United States*,
719 F.2d 1567 (Fed. Cir. 1983) ...................................................................................... 6

*Cashman Dredging & Marine Contracting Co. v. United States*,
148 Fed. Cl. 58 (2020) .................................................................................................. 23

*CHE Consulting, Inc. v. United States*,
78 Fed. Cl. 380 (2007), *aff'd*, 552 F.3d 1351(Fed. Cir. 2008) ................................... 15

*Comprehensive Health Servs., LLC v. United States*,
151 Fed. Cl. 200 (2020) .......................................................................................... 19, 21

*Davis Boat Works, Inc. v. United States*,
111 Fed. Cl. 342 (2013) ........................................................................................... 18

*Def. Tech., Inc. v. United States*,
99 Fed. Cl. 103 (2011) ............................................................................................. 23

*Found. Health Fed. Servs. v. United States*,
No. 93-1717, 1993 WL 738426 (D.D.C. Sept. 23, 1993) ........................................ 19

*Harmonia Holdings Grp., LLC v. United States*,
145 Fed. Cl. 583 (2019) ...................................................................................... 13, 15

*In re Aetna Gov't Health Plans, Inc.*,
B-254397 *et al.*, 1995 WL 449806 (Comp. Gen. July 27, 1995) ............................... 6

*Infrastructure Def. Techs., LLC v. United States*,
81 Fed. Cl. 375 (2008) ............................................................................................. 13

*Linc Gov't Servs., LLC v. United States*,
96 Fed. Cl. 672 (2010), *abrogated on other grounds by*
*Safeguard Base Operations, LLC v. United States*, 989 F.3d 1326 (Fed. Cir. 2021) .............. 23

*McVey Co. v. United States*,
111 Fed. Cl. 387 (2013) ........................................................................................... 12

*NetStar-1 Gov't Consulting, Inc. v. United States*,
98 Fed. Cl. 729 (2011) ............................................................................................. 21

*Newimar, S.A. v. United States*,
163 Fed. Cl. 240 (2022) ........................................................................................... 19

*Obsidian Sols. Grp., LLC v. United States*,
No. 20-1602C, 2021 WL 1688892 (Fed. Cl. Apr. 27, 2021),
*aff'd*, 54 F.4th 1371 (Fed Cir. 2022) ....................................................................... 19

*PAI Corp. v. United States*,
614 F.3d 1347 (Fed. Cir. 2010)....................................................................... 6, 7, 12

*Parcel 49C Ltd. P'ship v. United States*,
130 Fed. Cl. 109 (2016) ........................................................................................... 15

*PGBA, LLC v. United States*,
57 Fed. Cl. 655 (2003) ............................................................................................. 21

*Raymond Express Int'l, LLC v. United States*,
120 Fed. Cl. 413 (2015) ........................................................................................... 15

*Sierra Mil. Health Servs., Inc. v. United States*,
    58 Fed. Cl. 573 (2003) .................................................................. 19

*Sys. Plus, Inc. v. United States*,
    69 Fed. Cl. 757 (2006) .................................................................... 6

*Timberline Helicopters, Inc. v. United States*,
    140 Fed. Cl. 117 (2018) ............................................................ 23, 24

*Turner Constr. Co. v. United States*,
    645 F.3d 1377 (Fed. Cir. 2011) ...................................................... 12

*Vantage Assocs., Inc. v. United States*,
    59 Fed. Cl. 1 (2003) ....................................................................... 10

*XTRA Lease, Inc. v. United States*,
    50 Fed. Cl. 612 (2001) ................................................................... 13

**Statutes**

28 U.S.C. § 1491(b)(3) ......................................................................... 23, 24

**Other Authorities**

FAR 10.001(a)(2) ..................................................................................... 15

FAR 10.001(b) .......................................................................................... 16

FAR 10.002(a) .......................................................................................... 16

FAR 10.002(b)(1) ..................................................................................... 15

FAR 35.001 ............................................................................................... 11

FAR 8.405-6(a) ........................................................................................... 5

FAR 8.405-6(b) ....................................................................................... 5, 9

FAR 9.504(d) ............................................................................................ 12

FAR 9.505-2 ............................................................................................. 11

FAR 9.505-2(a) ........................................................................................ 10

FAR 9.505-2(a)(1) ................................................................................. 9, 10

FAR 9.505-2(a)(3) ................................................................................................................ 10

FAR 9.508(c) ...................................................................................................................... 11

**Regulations**

Point Blank Enterprises, Inc., USASPENDING.GOV,
    https://www.usaspending.gov/recipient/bb1d39b8-bc8e-f58b-2368-856b3a229506-
    C/latest (last visited July 7, 2023) ................................................................................ 20

## I.    INTRODUCTION

The Court should deny the request of Plaintiff Point Blank Enterprises, Inc. ("Point Bank") to issue a temporary restraining order ("TRO") and a preliminary injunction to stop the performance of Atlantic Diving Supply, Inc. ("ADS") under Blanket Purchase Agreement No. 70CMSW23A00000001 (the "BPA") awarded by the Department of Homeland Security, Immigration and Customs Enforcement ("ICE" or the "Agency").  The two orders that have been issued under the BPA are for mission critical body armor for ICE armed law enforcement agents in the field, and the enhanced ballistic features designed by ADS' supplier TYR Tactical ("TYR") are needed to ensure the safety of those agents.  A TRO and a preliminary injunction would cause multiple months of delay in getting this advanced body armor to the agents who are putting their lives on the line to protect our country.

Frustrated at its perceived mistreatment by certain officials within the Federal Bureau of Investigation ("FBI"), Point Blank is now attempting to prevent ICE, an entirely separate federal agency, from responsibly protecting its agents.  Point Blank's protest is based primarily on a speculative and legally deficient allegation that TYR somehow has a "biased ground rules" organizational conflict of interest ("OCI").  Contrary to established case law, Point Blank also invites this Court to second-guess the Agency's requirements and its method of satisfying them, and baselessly claims that ICE's market research was insufficient.  None of these allegations has any likelihood of succeeding on the merits.

In addition, Point Blank fails to provide any evidence that it will suffer irreparable harm in the absence of preliminary injunctive relief.  Indeed, Point Blank will not be irreparably harmed, as it remains fully eligible to participate in the competitive procurement that ICE plans to initiate during the short, 12-month ordering period of the BPA.  Given the life and safety concerns at issue

in this procurement, and the delays that will be caused by a TRO or preliminary injunction, the balancing of the hardships weighs heavily in favor of the Agency.  It is also clearly in the public interest to allow ICE to move forward with the orders placed under the BPA so it can fully protect its agents as soon as possible.  For these reasons, discussed in more detail below, ADS respectfully requests that the Court deny Point Blank's motion.

## II.    STATEMENT OF FACTS

This protest concerns Blanket Purchase Agreement ("BPA") No. 70CMSW23A00000001 awarded by ICE to ADS on May 17, 2023 for the supply of soft body armor made by TYR Tactical ("TYR").  The BPA award followed the March 15, 2023 issuance of Request for Information ("RFI") ICE 2022BARFI by the ICE Office of Firearms and Tactical Programs ("OFTP") to conduct market research on vendors available to provide Level IIIA approved soft body armor. AR 1, 501.

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████

ICE stated in the RFI that in addition to meeting the Certified National Institute of Justice concealable threat level IIIA body armor requirements, ICE was requesting "enhanced ballistic resistance features."  AR 1.  The enhanced features were "an internal removal vein behind the soft armor panel to help reduce a push of the soft armor into the area between the breasts" as well as "a ballistic resistant fold sewn into an elastic pouch that encapsulates the front panel." *Id*.  Further

███████████████████████████████████████████

details on the agency's minimum requirements were provided in attachments to the RFI. *See* AR 3-4, 7-21. Interested vendors were required to submit a male and female body armor kit in addition to a capabilities statement by March 23, 2023. AR 2. ICE stated that no award would be made from the RFI. *Id.* Additionally, the RFI stated that the government would not be restricted to any acquisition approach. *Id.*

In explaining the agency's present requirements, ICE's March 8, 2023 draft statement of work ("SOW") explains that recent testing at government facilities had identified a "skipping hazard." AR 8. The skipping hazard was identified by the FBI Ballistic Research Facility ("BRF"). On August 23, 2022, the FBI BRF authored a report titled "FEMALE BODY ARMOR RISK IDENTIFICATION & MITIGATION" ("the BRF Presentation"). AR 497; *see also* Compl. Ex. 1-A at 7-12, ECF No. 1-1. As detailed by ICE in its Market Research Report ("MRR"), the BRF Presentation explains that the FBI determined it needed to modernize its ballistic testing on soft body armor. AR 498. Part of these modernization efforts included testing body armor on ballistic gel molds of torsos to simulate "as worn" conditions. *Id.* Upon testing the body armor in the "as worn" condition, the FBI identified the skipping hazard. *Id.* The skipping hazard describes a situation in which projectiles could be guided upwards along the armor and into agents' throats. AR 8. This hazard was identified as a risk for females and males with disproportionately large chests. *Id.* As explained by ICE, this is a result of the sloped angle of the front panel above the breast. When projectiles are shot, the armor flexes into the area between the breasts without penetration, but the flexion changes the projectile's path and forces it upwards into the throat area. *Id.*

According to ICE's MRR, the BRF tested samples created by TYR, which was supplying soft body armor to the FBI at the time. AR 499; *see also* ECF No. 1-1 at 8 n.1. These samples,

██████████████████████████████████████ solved the skipping hazard.  AR 499.  The

BRF Presentation stated that ██████████████████████████████████████████

████████████████████████████████  AR 499; *see also* ECF No. 1-1 at 12.

ICE's MRR states that ICE was initially informed about the skipping hazard from participants who attended the Women in Federal Law Enforcement ("WIFLE") conference in August 2022.  AR 496.  At that conference, the FBI BRF gave a presentation which detailed the skipping hazard.  *Id*.  ICE received additional information later in August 2022 and then again in November 2022.  AR 496-97.

In order to protect its agents against this skipping hazard, ICE initiated market research to identify vendors that could provide NIJ Level IIIA certified soft body armor with two principal "enhanced ballistic resistance features."  AR 8.  First, ICE required "an internal removable vein behind the soft armor panel to help reduce a push of the soft armor into the area between the breasts."  *Id.*  Second, ICE required "a ballistic resistant fold sewn into an elastic pouch that encapsulates the front armor panel in such a way that [the] front armor panel will have ballistic fold protection when removed from Overt Tactical Carrier (OTC) and worn in the concealed carrier."  *Id.*  The requested ballistic fold was required to rest along the top ridge of the front panel in order to catch any "upward moving stray projectiles."  *Id*.

As described in the MRR, ████████████████████████████████

██████████████████████████████████████████████████████████

██████████████  AR 497; *see also* AR 8 (Draft SOW).  This information allowed all vendors to understand the issue and submit samples of solutions that complied with ICE's requirements. As explained in its MRR, ████████████████████████████████████████████

██████████████  AR 497.

██████████████████████████████████████████████████████

In response to the RFI, ICE received four responses and samples: one from Point Blank, one from SRT Supply with a Point Blank-manufactured sample, one from Safe Pro Group, and one from ADS selling the TYR product.  AR 501.  ICE then evaluated the four samples to determine whether they met ICE's requirements.  AR 485-87.  The TYR body armor was the only sample provided that passed every requirement set forth by ICE.  *Id.* at 485-86, 501.

As a result of the testing, ICE concluded that only one vendor, ADS, could meet its needs. AR 501-02.  As such, on April 19, 2023, the Contracting Officer requested a quote from ADS for TYR body armor, which ADS submitted the same day.  AR 507-08, 510-13.

ICE subsequently documented its determination that only one vendor, ADS, could meet its needs in a Limited Source Justification, J&A-23-0095 (the "J&A"), dated May 3, 2023. AR 519-24.  The J&A noted that the BPA would be issued under the authority of FAR 8.405-6(a) and (b). *Id.* at 519.  As part of its rationale, ICE reiterated its need for a body armor solution to address the life-threatening skipping hazard: ███████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████  *Id.* at 520.  ICE also explained that, ███████████████████████

███████████████████████████████████████████████████████████

███████████████████████  AR 522-23.

The J&A indicated that the ADS BPA award would have a 12-month ordering period. AR 519.  ICE also stated its intention to issue a competitive acquisition for this type of body armor in the future during the BPA ordering period.  AR 523.

On May 17, 2023, ICE awarded the BPA to ADS under ADS' General Services Administration Schedule Contract, with a ceiling value of $14,498,756.96.  AR 542-44.  The next

███████████████████████████████████████████████████████████

day, ICE also issued the first BPA call, No. 70CMSW23FC0000057, as the first delivery order under the BPA, in the amount of $3,852,638.78. *Id.* at 585-89. The first order requires delivery by February 28, 2024. *Id.* at 585. On June 8, ICE issued the second BPA call, No. 70CMSW23FC0000073, as the second delivery order under the BPA, in the amount of $4,056,273.78. *Id.* at 615-21. This second order requires delivery by May 15, 2024. *Id.* at 615.

On June 16, 2023, Point Blank filed its Complaint protesting the award to ADS.

## III. ARGUMENT

### A. Point Blank Cannot Demonstrate a Substantial Likelihood of Success on the Merits in any of its Protest Grounds.

#### 1. Point Blank has no likelihood of succeeding on its argument that TYR has an unmitigated biased ground rules OCI.

Point Blank's allegation that TYR has a biased ground rules OCI utterly fails, on both the facts and the law. As such, Point Blank's likelihood of succeeding on the merits of this allegation is zero, and its request for preliminary injunctive relief should be denied.

As Point Blank explains in its memorandum, a biased ground rules OCI occurs in situations where a company sets the ground rules for future government contracts, "by, for example, writing the statement of work or the specifications." *Sys. Plus, Inc. v. United States*, 69 Fed. Cl. 757, 773 (2006) (quoting *In re Aetna Gov't Health Plans, Inc.*, B-254397 *et al.*, 1995 WL 449806, at *8 (Comp. Gen. July 27, 1995)). In order to successfully allege an organizational conflict of interest, a plaintiff must provide "hard facts; a mere inference or suspicion of an actual or apparent conflict is not enough." *PAI Corp. v. United States*, 614 F.3d 1347, 1352 (Fed. Cir. 2010) (internal quotation marks omitted); *see also CACI, Inc.-Fed. v. United States*, 719 F.2d 1567, 1581-82 (Fed. Cir. 1983) (holding that it was improper for the Claims Court to make a determination of impropriety based on "inferences of actual or potential wrongdoing by [the agency] on suspicion

and innuendo, not on hard facts"). The hard facts alleged must show either an impropriety or the appearance of an impropriety, but the facts presented must be "concrete[]" rather than "vague allegations" or "suspicion and innuendo" that are asserted as facts. *Am. K-9 Detections Servs., LLC v. United States*, 155 Fed. Cl. 248, 285 (2021) (citation omitted).

First, Point Blank's complaint and request for preliminary injunctive relief are devoid of any hard facts that would indicate an actual or apparent conflict of interest. Point Blank boldly asserts that "there can be no reasonable dispute that TYR Tactical, in conjunction with the FBI, prepared the specifications and testing parameters for the body armor purchased by DHS." ECF No. 27-1 at 17. As support for this claim, Point Blank relies entirely on one phrase in the FBI's BRF Presentation: ███████████████████████████████████████████████████████ *Id.* (citing ECF No. 1-1 at 11-12). As is obvious from that sentence, it says nothing about TYR drafting specifications or testing parameters – either for DHS/ICE or the FBI. Unsupported assertions by counsel are insufficient to establish an actual or even a potential OCI. *See PAI Corp.*, 614 F.3d at 1353 (finding that plaintiff "failed to introduce any evidence" to establish hard facts supporting an OCI allegation). Point Blank has attempted to conjure an OCI with suspicions and innuendo – the very strategy that has been soundly rejected by this Court and the Court of Appeals.

In addition to being unsupported and speculative, Point Blank's assertions are also entirely illogical. Point Blank fails to explain why TYR would have been asked to prepare specifications or testing requirements on what Point Blank characterizes as a "firm-fixed price Blanket Purchase Agreement with the FBI for the purchase of TYR Tactical body armor." ECF No. 27-1 at 2. The agreement with the FBI was a supply contract for the delivery of products, not an acquisition support contract requiring the preparation of specifications for future procurements. And Point Blank makes no attempt to explain why TYR would have been asked to prepare specifications or

███████████████████████████████████████████████████

testing requirements for use by ICE – an entirely separate federal agency.  Point Blank also conveniently ignores evidence in the BRF Presentation that TYR was not involved in the FBI's testing of the TYR-designed enhancements.  *See* ECF No. 1-1 at 12 (███████████████████ ███████████████████████████████████████████████████████ ████████████████████████████████ (emphasis added)).

For the Court's benefit, attached to this Response is the Declaration of Jason Beck, the CEO of TYR.[1]  *See* Exhibit A.  As explained by Mr. Beck, the FBI raised its concern about the "skipping" issue with TYR during a semiannual performance meeting provided for in the FBI contract (on which ADS was the prime contractor).  *Id.* ¶¶ 5-6.  The purpose of these contractually required semiannual meetings is to discuss performance and resolve any concerns informally.  *Id.* After the FBI raised the issue, TYR designed ████████████ as a solution within a few weeks. *Id.*  The FBI provided no input into how TYR solved the skipping issue nor did it direct TYR to create a solution.  *Id.* ¶¶ 6-7.  However, TYR implemented a unique concept and has a patent pending for the ██████████ design.  *Id.* ¶ 7; *see also* AR 47-169.  The FBI was solely responsible for testing the TYR body armor with ████████████ – TYR did not participate in any testing and was not even on site for the testing.  Ex. A, ¶ 8.  TYR did not prepare any specifications or testing requirements for the FBI (or for ICE), and did not provide any input on specifications or testing requirements to either agency.  *Id.* ¶ 10.  TYR was not present at the Women in Federal Law Enforcement ("WIFLE") conference and did not receive a copy of the BRF Presentation from the FBI.  *Id.* ¶¶ 11-12.

---

[1] ADS submits Mr. Beck's declaration pursuant to RCFC 7(b). ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████

In the end, the only facts that Point Blank has actually established are that (1) the FBI identified a "skipping" flaw in existing female body armor while TYR was performing on a prior contract, (2) TYR developed a product enhancement to address that flaw, (3) the FBI tested that enhancement, and (4) the FBI purchased new female body armor sets that included the enhancement. AR 498-99. These facts do not establish that TYR was involved in setting the ground rules for the ICE procurement at issue in this protest. Point Blank seems to believe that since TYR sold its enhanced body armor on a prior contract, it is somehow prohibited from selling similar enhanced armor on a subsequent contract. But that would obviously not be the case, even if the two procurements were conducted by the same agency. *See Am. K-9 Detection Servs.*, 155 Fed. Cl. at 285 (holding the fact that a contractor is the incumbent is, by itself, insufficient to create an OCI). While Point Blank may be frustrated that ICE has decided to purchase body armor with features that exist only in TYR's products, TYR does not have an OCI simply because it developed those features. *See* FAR 8.405-6(b) (permitting agencies to purchase "item[s] peculiar to one manufacturer").

Leaving aside Point Blank's failure to factually support its allegation, Point Blank's novel OCI theory also fails as a matter of law. Even assuming *arguendo* that TYR had delivered specifications or testing requirements for the enhanced ballistic features to the FBI (which it did not), it still would not have a biased ground rules OCI. Point Blank relies heavily on FAR 9.505-2(a)(1), which states that "[i]f a contractor prepares and furnishes complete specifications covering nondevelopmental items, to be used in a competitive acquisition, that contractor shall not be allowed to furnish these items, either as a prime contractor or as a subcontractor, for a reasonable period of time including, at least, the duration of the initial production contract." *See* ECF No. 27-1 at 16, 18. But Point Blank has not alleged that TYR furnished specifications "to be

used in a competitive acquisition."  Nor could it, since Point Blank itself concedes that TYR's scope of work under the FBI contract was limited to producing and delivering body armor – not assisting with acquisition planning.  *See* ECF No. 27-1 at 2 (describing FBI contract).

Moreover, the FAR sets forth an exception to the rule in Section 9.505-2(a)(1) that would cover the precise (albeit fictional) scenario that Point Blank has described in its filings. Specifically, the FAR states that "[t]he restriction in [FAR 9.505-2(a)(1)] shall not apply to . . . [c]ontractors that furnish at Government request specifications or data regarding a product they provide, even though the specifications or data may have been paid for separately or in the price of the product."  If TYR had provided the FBI with specifications for its enhanced ballistic features (which it did not), those specifications would have been for a product that TYR was providing to the FBI on that same contract.  Therefore, the rule at FAR 9.505-2(a)(1) would have been inapplicable, and TYR would not have a biased ground rules OCI.

Finally, the biased ground rules prohibitions of FAR 9.505-2(a) are inapplicable to contractors that designed or developed the items being purchased.  *See* FAR 9.505-2(a)(3).  The FAR explains the underlying policy behind the development and design exception as follows:

> In development work, it is normal to select firms that have done the most advanced work in the field.  These firms can be expected to design and develop around their own prior knowledge. Development contractors can frequently start production earlier and more knowledgeably than firms that did not participate in the development, and this can affect the time and quality of production, both of which are important to the Government. In many instances the Government may have financed the development. Thus, while the development contractor has a competitive advantage, it is an unavoidable one that is not considered unfair; hence no prohibition should be imposed.

FAR 9.505-2(a)(3); *see also Vantage Assocs., Inc. v. United States*, 59 Fed. Cl. 1, 11-12 (2003) (finding that the incumbent contractor was the development and design contractor so participation

was permitted); *AAR Mfg., Inc. v. United States*, 149 Fed. Cl. 514, 525-26 (2020) (discussing the development and design exception).

While TYR was not a "development contractor" per se (since the FBI contract was a supply contract), TYR indisputably designed and developed the enhanced ballistic features at issue in this protest. *See* AR 47-169; *see also* FAR 35.001 (defining "development" to include the design of "an improvement in an existing product"). Therefore, even if TYR had delivered specifications for those new features to the FBI (which it did not), it would be exempted from the restrictions at FAR 9.505-2 because it developed those features. *See* FAR 9.508(c) (providing the following example of the application of the OCI rules: "Company A develops new electronic equipment and, as a result of this development, prepares specifications. Company A may supply the equipment."). Put simply, the fact that TYR designed safer body armor, and agencies now want to protect their personnel by purchasing that safer armor, does not create an OCI.

Finally, the Contracting Officer did not "ignore TYR Tactical's OCI," as Point Blank asserts. *See* ECF No. 27-1 at 18. Point Blank discussed its speculative OCI claim in the cover letter to its capability statement (AR 191-92), so the Contracting Officer was obviously aware of Point Blank's allegations. But the Contracting Officer also knew that ICE had written its own specifications for the RFI without any involvement of TYR, so there was no way that TYR could have a biased ground rules OCI. In other words, the OCI theory that Point Blank advanced in its capability statement (and continues to advance in this protest) is so far outside the circumstances that would actually constitute a biased ground rules OCI that there was nothing for the Contracting Officer to consider or memorialize in writing. The Federal Circuit has explained as follows:

> [FAR] Section 9.504(a) requires that a contracting officer "(1) [i]dentify and evaluate potential organizational conflicts of interest as early in the acquisition process as possible; and (2)[a]void,

> neutralize, or mitigate *significant potential conflicts* before contract award." 48 C.F.R. § 9.504(a) (emphasis added). This regulation requires a contracting officer to identify and evaluate potential conflicts in the early stages of the acquisition process. ***Section § 9.504(a) does not require that this preliminary analysis be documented in writing***, but if a potential conflict is identified, the regulation specifies that the contracting officer must avoid, neutralize, or mitigate any "significant potential conflicts" before the contract award. *Id.* § 9.504(a).

*PAI Corp.*, 614 F.3d at 1352 (second emphasis added); *see also Turner Constr. Co. v. United States*, 645 F.3d 1377, 1386 (Fed. Cir. 2011) ("Although the FAR requires a contracting officer to identify and evaluate potential conflicts in the early stages of the acquisition process, [FAR] § 9.504(a) does not require that this preliminary analysis be documented in writing."); *McVey Co. v. United States*, 111 Fed. Cl. 387, 407 (2013) ("to the extent that [the CO] acted within her discretion in determining that no significant conflict of interest existed, no documentation was required").

FAR 9.504(d) is also instructive:

> In fulfilling their responsibilities for identifying and resolving potential conflicts, contracting officers should avoid creating unnecessary delays, burdensome information requirements, and excessive documentation. The contracting officer's judgment need be formally documented only when a substantive issue concerning potential organizational conflict of interest exists.

Given the fact that the ICE moved forward with the BPA award to ADS notwithstanding the speculative allegations in TYR's capability statement, the Contracting Officer clearly determined that a "substantive issue" concerning a potential OCI did not exist.  That determination – which was not required to be documented – was reasonable, for all of the reasons discussed above.

> **2.    Point Blank has no likelihood of succeeding on its argument that the RFI is unduly restrictive and not related to legitimate agency needs.**

Like its OCI argument, Point Blank has no likelihood of succeeding on its claim that ICE's requirements are not rationally related to any legitimate need.  As an initial matter, ICE has wide

discretion to determine its own technical needs. *See Infrastructure Def. Techs., LLC v. United States*, 81 Fed. Cl. 375, 393 (2008) (holding that an agency's determination of its own needs is within the agency's "broad discretion" and is "not for this court to second guess" (citation omitted)); *see also XTRA Lease, Inc. v. United States*, 50 Fed. Cl. 612, 625 (2001) (same). The agency also has broad discretion in selecting the best way to accommodate those needs. *See ABF Freight Sys., Inc. v. United States*, 55 Fed. Cl. 392, 409 n.13 (2003) ("The law is well-settled that the determination of an agency's procurement needs and the best method for accommodating them are matters primarily with the agency's discretion.").

Point Blank boldly asserts that ICE's stated requirements are mere "pretext" and questions the legitimacy of the Agency's needs. ECF No. 27-1 at 23. The allegation is particularly stunning considering that agents' lives depend on whether or not the selected body armor provides the necessary protection, so Point Blank's arguments border on an accusation that ICE has acted in bad faith. And it is "well established that government officials enjoy the presumption that their actions are taken in good faith." *Harmonia Holdings Grp., LLC v. United States*, 145 Fed. Cl. 583, 595 (2019). ICE thoroughly explained the need for the RFI's enhanced ballistic requirements in its Limited Sources Justification:





AR 522-23.

Moreover, and contrary to Point Blank's arguments, the key features in dispute *are* essential to the Government's requirements and needs. For example, Point Blank argues that ICE's requirement for an internal projectile trap is not needed to "mitigate" the skip effect (ECF No. 27-1 at 20), but this argument is based on a fundamental misunderstanding of ICE's needs. ICE was not merely looking for additional throat protection, such as Point Blank's external throat/collar protector. Instead, as is evident from the RFI, ICE needed a solution that would capture the projectile in the armor itself, thereby protecting the agent even in situations where wearing an external throat/collar protector would not be feasible (for example, when agents are wearing the armor in a concealed carrier):

> Soft Body Armor Kits shall include a ballistic resistant fold sewn into an elastic pouch that encapsulates the front armor panel in such a way that front armor panel will have ballistic fold protection when removed from Overt Tactical Carrier (OTC) *and worn in the concealed carrier*. The ballistic fold should be positioned so as to rest along the top ridge of the front panel to *catch any upward moving stray projectiles.*

AR 8 (emphasis added); *see also* AR 500 ███████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████. This is why ICE required an internal projectile trap and not simply additional neck protection. The RFI did express a need for a collar and a throat protector as part of the separate Ancillary Soft Kit (AR 12), but these requirements were *in addition to* the

requirement for an "internal projectile trap . . . to *prevent* projectiles from skipping/ricocheting up towards neck area." AR 10 (emphasis added).[2]

Contrary to precedent, Point Blank is asking this Court to second guess ICE's determination of its own needs. The Court should decline the invitation, especially since the needs and requirements at issue were identified to protect agents' lives. *See Parcel 49C Ltd. P'ship v. United States*, 130 Fed. Cl. 109, 126-27 (2016) ("re-examining [the agency's public safety requirements] is not the role of this Court when determining whether the [agency's] requirements unduly restrict competition"); *CHE Consulting, Inc. v. United States*, 78 Fed. Cl. 380, 387 (2007) ("where acquisitions concerning national defense and security are involved, the Court must afford even wider deference to the agency"), *aff'd*, 552 F.3d 1351(Fed. Cir. 2008).

### 3.   Point Blank has no likelihood of succeeding on its argument that the sole source award was based on inadequate market research.

Finally, Point Blank's argument that ICE conducted inadequate market research is also without merit. This Court has recognized that "an agency is afforded 'substantial discretion in the scope and manner of conducting market research.'" *Harmonia Holdings*, 145 Fed. Cl. at 595 (quoting *Raymond Express Int'l, LLC v. United States*, 120 Fed. Cl. 413, 431 (2015)). This is because the FAR instructs that the market research must be "appropriate to the circumstances." *Id.* (quoting FAR 10.001(a)(2)). The "extent of market research will vary, depending on such factors as urgency, estimated dollar value, complexity, and past experience." FAR 10.002(b)(1). The FAR also states that "[w]hen conducting market research, agencies should not request

---

[2] Since ICE's decision to require the internal projectile trap was a reasonable exercise of the Agency's discretion, and since Point Blank concedes that its product does not satisfy that requirement (ECF No. 27-1 at 20), Point Blank's arguments regarding additional requirements in the RFI are moot. *Id.* at 21-23.

potential sources to submit more than the minimum information necessary." FAR 10.001(b). Moreover, when embarking on an acquisition, the description of the Government's needs need only be stated "in terms sufficient to allow conduct of market research." FAR 10.002(a).

The record shows that ICE thoroughly documented its market research, primarily in a Market Research Report dated April 19, 2023. *See* AR 496-506. The Market Research Report explains that after being made aware of the "skipping" hazard, ICE determined that it needed to equip its agents with body armor that would defeat the hazard. AR 497. This determination was based on FBI documentation which was made available to ICE. AR 496-97. In determining that it needed body armor above and beyond the National Institute of Justice standards, ICE explained

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████ AR 499.

In order to understand the marketplace of vendors capable of providing body armor that prevented the skipping hazard, ICE issued RFI No. 2022BARFI as part of its market research. AR 501. The record shows that ICE carefully assessed the sample body armor kits submitted by each of the four vendors that responded to the RFI. For example, the Agency prepared an "RFI Response Evaluation Abstract" in which it documented whether each sample satisfied each of 43 requirements set forth in the RFI. *See* AR 485-87. These results are summarized in the Market Research Report (AR 501) and in the Award Decision Memorandum (AR 566-67). Only one sample, TYR's, provided the requisite protection for ICE agents. AR 502. As such, ICE sought approval for a Limited Sources Justification. AR 519-24.

Point Blank makes three discrete allegations regarding the sufficiency of ICE's market research, none of which has merit. First, Point Blank claims that ICE evaluated the vendors'

███████████████████████████████████████████████████
██████████████████████████████████████

sample using an unstated requirement for the samples to meet "FBI benchmark standards" for throat protection.  ECF No. 27-1 at 24-25.  This allegation is based entirely on the fact that ICE's Limited Sources Justification notes that TYR's body armor includes "unique integrated throat protection which meets FBI benchmark standards for throat protection."  *Id.* at 24 (quoting AR 520 / ECF No. 1-1 at 421).  Contrary to Point Blank's assertion that this was an unstated requirement, the record makes clear that "FBI benchmark standards" merely refers to ██████████

████████████████████████████████████████████████████████████████

██████████████████████████████████████████  AR 497, 566.  In other words, when ICE stated in the Limited Sources Justification that TYR's armor satisfies the "FBI benchmark standards," it meant that TYR's armor includes the enhanced ballistic resistance features described in the RFI.  ICE did not assess the vendors' sample using an unstated requirement.

Second, Point Blank argues that ICE's market research was inadequate because the RFI (as amended) did not include a requirement for "ancillary plate carriers," which ICE included in the BPA awarded to ADS.  ECF No. 27-1 at 25-26.  The inclusion of plate carriers in the BPA issued to ADS is not reflective of inadequate market research.  As noted above, "[w]hen conducting market research, agencies should not request potential sources to submit more than the minimum information necessary."  FAR 10.001(b).  Moreover, unlike a request for proposals, an RFI used to conduct market research is not required to include every detail regarding the agency's requirements.  *See Assessment & Training Sols. Consulting Corp. v. United States*, 92 Fed. Cl. 722, 730-31 (2010) (denying allegation that Sources Sought notice contained an insufficient description of the agency's needs, and noting that "the Contracting Officer had discretion under the relevant regulations to conduct market research 'appropriate to the circumstances'").

████████████████████████████████████████████████████████████████

It is evident from the record that ICE was most interested in learning which vendors could satisfy its requirements for soft body armor ballistic panels, the tactical outer garment carrier, optional pouches, and an ancillary soft kit. *See* AR 3-4. Once ICE determined that TYR was the only manufacturer that could satisfy ICE's key requirements for these items, there would have been no purpose to conducting further market research on plate carriers, since end users would logically need plate carriers made by the same manufacturer as the soft body armor kit (to ensure compatibility). Moreover, since Point Blank's armor did not satisfy ICE's requirements for soft body armor, Point Blank could not have been prejudiced by the fact that the RFI did not describe the Agency's intent to purchase ancillary plate carriers. *Davis Boat Works, Inc. v. United States*, 111 Fed. Cl. 342, 351-52 (2013) (finding the plaintiff could not show prejudice when its proposal failed to demonstrate the required qualifications).

Finally, Point Blank's argument that the Agency did not "meaningfully consider" any product other than TYR's product (ECF No. 27-1 at 26) is directly undermined by the Limited Sources Justification and the other documents in the record. As discussed above, the record demonstrates that ICE thoroughly evaluated each of the samples submitted by the four vendors that responded to the RFI. *See, e.g.*, AR 485-87, 501, 566-67. ICE was not required to provide feedback or engage in discussions with Point Blank, as Point Blank suggests (without authority). ECF No. 27-1 at 26. Because Point Blank admits that its product did not satisfy the requirements in the RFI, this allegation is meritless.

### B.  Point Blank Cannot Meet its Burden to Show a Likelihood That it Will Be Irreparably Harmed Absent Preliminary Injunctive Relief.

Point Blank asserts three purported irreparable harms that it will suffer absent an injunction – lost profits, damage to its ability to serve its customers, and damage to its ability to compete in

future procurements.  ECF No. 27-1 at 27-29.  Point Blank has offered no evidentiary support for any of its alleged harms.  Moreover, each purported harm fails to stand up to scrutiny even putting aside the fact that it is asserted purely by attorney argument and not actual evidence.

In determining whether a claim presents irreparable harm, the Court looks to whether the plaintiff has an adequate remedy in the absence of an injunction.  *Comprehensive Health Servs., LLC v. United States*, 151 Fed. Cl. 200, 207 (2020) (holding that injunctive relief was not warranted because the protester would not lose the ability to compete for a later contract). "Any injury alleged must be 'both certain and great,' and the movant must convey that the hardship will have an 'immediate and substantial impact.'"  *Newimar, S.A. v. United States*, 163 Fed. Cl. 240, 253 (2022) (quoting *ACI Techs., Inc. v. United States*, 162 Fed. Cl. 39, 48 (2022)).  Courts have declined to find irreparable harm when a plaintiff claims unspecified economic hardship.  *Obsidian Sols. Grp., LLC v. United States*, No. 20-1602C, 2021 WL 1688892, at *4 (Fed. Cl. Apr. 27, 2021) ("Economic harm to the moving party, standing alone, will not satisfy that burden"), *aff'd*, 54 F.4th 1371 (Fed Cir. 2022); *see also Sierra Mil. Health Servs., Inc. v. United States*, 58 Fed. Cl. 573, 582 (2003) ("economic loss does not, in and of itself, constitute irreparable harm. Only economic loss that threatens the survival of a movant's business constitutes irreparable harm") (quoting *Found. Health Fed. Servs. v. United States*, No. 93-1717, 1993 WL 738426, at *3 (D.D.C. Sept. 23, 1993)).  Arguments of economic loss have been undercut by evidence that the movant has been awarded other government contracts.  *See Newimar*, 163 Fed. Cl. at 255 (holding no irreparable harm when plaintiff claimed significant economic loss despite evidence that the Department of Defense had recently awarded the plaintiff a five-year, $5 million contract). Point Blank cannot meet its burden of showing that irreparable harm is not merely possible, but likely.

Point Blank uses its unfounded OCI allegation to bootstrap a lost profits argument (ECF No. 27-1 at 28), but the OCI allegation does not establish any likelihood of lost profits.  The record is clear in that ICE did not commit to awarding <u>any</u> contract based on the RFI.  AR 2.  As such, Point Blank has provided no evidence that it would have been awarded any contract at all but for the alleged procurement deficiencies in the award to ADS.  This is true even if TYR were somehow found to be ineligible (which it is not).  In fact, the record shows that ███████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████ AR 496, 565.

Point Blank's argument is further undercut by the fact that Point Blank has received seven new government contracts in Fiscal Year 2023, and the Government has obligated over $59 million to Point Blank's contracts during that same time period. *See* Point Blank Enterprises, Inc., USASPENDING.GOV,                                                   https://www.usaspending.gov/ recipient/bb1d39b8-bc8e-f58b-2368-856b3a229506-C/latest (last visited July 7, 2023) Thus, in addition to any lost profits being illusory (due to a lack of evidence that Point Blank would receive any award from ICE), Point Blank has also failed to demonstrate that any hypothetical lost profits would have a substantial impact on Point Blank's business.

Point Blank's argument that its ability to serve its customers will be irreparably harmed in the absence of preliminary injunctive relief is also meritless for the same reasons.  Point Blank is not only performing existing contracts – and conspicuously has not alleged any negative performance assessments under those contracts relating to a lack of enhanced ballistic features – but is also continuing to secure new contract awards to supply its body armor to government customers.  Moreover, as a factual matter, Point Blank's complaints about the FBI's actions prior

to the ICE RFI have nothing to do with ICE or any alleged harm to Point Blank from allowing ADS' performance of this BPA to continue.  Simply put, even if Point Blank were correct that the FBI's actions somehow harmed Point Blank, those purported actions and harms occurred wholly independently of the ICE RFI and would exist whether or not ICE had awarded a BPA to ADS, and thus bear no logical connection to whether a preliminary injunction stopping work on the ICE BPA is justified.  Moreover, the actions that Point Blank cites as causing harm – such as the FBI's purported refusal to disclose test parameters to Point Blank – do not hold up to factual scrutiny, as these requirements were not provided to any interested vendors and were not actions or omissions by the relevant agency in this protest, which is ICE.

Finally, Point Blank's argument that "allowing the agency to proceed with performance of this Contract (and any orders issued thereunder) will irreparable [sic] harm Point Blank's ability to compete in any future procurement" is likewise meritless.  ECF No. 27-1 at 29.  The sole source BPA has only a 12-month ordering period, and the J&A states that "ICE will issue a competitive acquisition in the future to acquire body armor during the BPA ordering period."  AR 523.  Thus, Point Blank will have an opportunity to compete in the near future to provide soft body armor that meets ICE's needs. *Comprehensive Health Servs.*, 151 Fed. Cl. at 207.

Moreover, the cases cited by Point Blank discussing the loss of a competitive advantage are inapplicable here.  ECF No. 27-1 at 29.  First, Point Blank cites to *NetStar-1 Government Consulting, Inc. v. United States*, 98 Fed. Cl. 729, 734-35 (2011).  However, the Court in that case made its determination based in part on the fact that the protester would lose key personnel.  *Id.* Here, no employees are being poached so as to impede Point Blank's ability to compete in the future.  Second, Point Blank cites to *PGBA, LLC v. United States*, 57 Fed. Cl. 655, 664 (2003).  However, in *PGBA*, the plaintiff provided affidavits establishing that it would lose its pre-existing

business in the absence of an injunction. Point Blank has made no such allegations here. Lastly, Point Blank cites *Amazon Web Servs., Inc. v. United States*, 147 Fed. Cl. 146, 155-56 (2020). However, in that case the plaintiff also provided a declaration noting that continued contract performance would cause it to lose its pre-existing business, and would also provide the awardee with access to non-public information that would allow the awardee to tailor its submission in a recompetition. Point Blank does not make these allegations, nor could it.

Point Blank's claim regarding future procurements is far too generalized and speculative to support a finding of irreparable harm, as Point Blank does not explain how or why it will suffer a competitive disadvantage – it simply asserts (without support) that it will.

### C.    The Balance of Hardships Counsels Against Preliminary Injunctive Relief.

The first two factors above decisively counsel against a preliminary injunction, as Point Blank has not met its burden of proof to establish a substantial likelihood of success on the merits in this protest or any irreparable harm in the absence of a preliminary injunction. In order to establish the necessity of a preliminary injunction, the plaintiff must establish <u>both</u> that it will succeed on the merits and that it will be irreparably harmed. *Amidon, Inc. v. United States*, 124 Fed. Cl. 517, 522 (2015); *see also Altana Pharma AG v. Teva Pharms. USA, Inc.,* 566 F.3d 999, 1005 (Fed. Cir. 2009) ("Although the factors are not applied mechanically, a movant must establish the existence of both of the first two factors to be entitled to a preliminary injunction"); *Amazon.com, Inc. v. Barnesandnoble.com, Inc.,* 239 F.3d 1343, 1350 (Fed. Cir. 2001) ("Our case law and logic both require that a movant cannot be granted a preliminary injunction unless it establishes *both* of the first two factors, *i.e.,* likelihood of success on the merits and irreparable harm.").

Putting aside whether Point Blank can succeed on its motion despite failing to establish the first two factors, the third factor also weighs against a preliminary injunction. When weighing the harms to each party, the Court balances the potential harm to the plaintiff without injunctive relief against the harm inflicted upon the government and intervenor if preliminary injunctive relief were awarded. *Cashman Dredging & Marine Contracting Co. v. United States*, 148 Fed. Cl. 58, 67-68 (2020). If the balance of harms is neutral or tips in favor of the government and intervenor, injunctive relief is not appropriate. *Id.*

The Court "is statutorily required to give deference to the interests of national security and national defense." *Def. Tech., Inc. v. United States*, 99 Fed. Cl. 103, 131 (2011) (citing 28 U.S.C. § 1491(b)(3)). *See also Linc Gov't Servs., LLC v. United States,* 96 Fed. Cl. 672, 704-05 (2010) (holding that "the public interest in national defense and national security weighs heavily against the grant of a permanent injunction"), *abrogated on other grounds by Safeguard Base Operations, LLC v. United States*, 989 F.3d 1326 (Fed. Cir. 2021). Examples of significant harm include gaps in security services (*Eskridge Rsch. Corp. v. United States*, 92 Fed. Cl. 88, 100 (2010)); and interruption of services that are essential to the protection of public safety (*Timberline Helicopters, Inc. v. United States*, 140 Fed. Cl. 117, 121 (2018)). Even assuming *arguendo* that the Court finds that Point Blank may succeed on the merits and that it will be irreparably harmed (which it will not), the balancing of harms strongly weighs in favor of denying a preliminary injunction.

Point Blank is flatly wrong that the Agency will suffer "no hardship" from preliminary injunctive relief, and its callous assertion that "there are no security, safety, or other compelling interests at stake" is astonishing. ECF No. 27-1 at 30, 31. Point Blank apparently requires proof that the "skipping" issue has impacted an agent in the field before it will take the concern seriously (*see* Compl. ¶ 15, ECF No. 1), but the identified risk to agents' lives cannot be discounted. The

information in the AR establishes that ████████████████████████████████████

███████████████████████████████████ AR 522-23.  ICE needs body armor with enhanced

ballistic features to prevent this risk as soon as possible.  Moreover, Point Blank's focus on the

purported length of time between the *FBI's* identification of the skipping issue and the *FBI's*

announcement of it to other agencies is wholly unrelated to whether *ICE* has a compelling and

immediate interest in national security and agent safety that must be protected by allowing this

procurement to proceed without delay.

In addition, far from a TRO or preliminary injunction causing a "minor delay," as Point

Blank claims (ECF No. 27-1 at 30), TYR has explained that the impact would be ████████████

██████████ in delivering new body armor to ICE.  *See* Ex. A ¶ 14. ████████████████████

████████████████████████████████████████████████████████████████████████

███████████████████████████████ thereby compromising the safety of ICE

agents. *Id.*

### D.    The Public Interest Counsels Against Preliminary Injunctive Relief.

As discussed above, the Court gives substantial weight to protecting public safety.

*Timberline Helicopters*, 140 Fed. Cl. at 121.  Moreover, the Court is statutorily required to give

due regard to national security and national defense.  28 U.S.C. § 1491(b)(3).  As aptly described

by the government, there is substantial public interest in protecting ICE agents in the field.

Point Blank has cast no legitimate doubt on the integrity of this procurement.  As discussed

above, Point Blank's allegation regarding TYR's purported OCI and its claims regarding the

alleged flaws in ICE's RFI are not likely to succeed on the merits.  The fact that Point Blank

continues to believe that its product would better meet the Agency's needs than TYR's product

does not reveal any defects in ICE's process, much less any harm to the public interest.  The public

████████████████████████████████████████████████████████████████████████
██████████████████████████

interest factor clearly weighs against preliminary injunctive relief so that ICE can expeditiously protect its agents in the field.

## IV.    CONCLUSION

ADS respectfully requests that this Court deny Point Blank's motion for a temporary restraining order and a preliminary injunction.


Dated July 7, 2023                                        Respectfully submitted,

                                                           s/Jamie F. Tabb_____
                                                          Jamie F. Tabb
                                                          Vinson & Elkins L.L.P.
                                                          2200 Pennsylvania Avenue, NW
                                                          Suite 500 West
                                                          Washington, D.C. 20037
                                                          (202) 639-6773
                                                          jtabb@velaw.com
                                                          *Attorney of Record*

                                                          *Of Counsel*:
                                                          Elizabeth Krabill McIntyre
                                                          Leslie Edelstein

                                                          *Attorneys for Atlantic Diving Supply, Inc.*