Redacted Version

## IN THE UNITED STATES COURT OF FEDERAL CLAIMS
### Bid Protest

| | | |
|---|---|---|
| **POINT BLANK ENTERPRISES, INC.** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Case No. 1:23-cv-00913-DAT** |
| | ) | |
| **v.** | ) | **Judge Tapp** |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | ██████████████ |
| | ) | |
| **Defendant, and** | ) | |
| | ) | |
| **ATLANTIC DIVING SUPPLY, INC.** | ) | |
| | ) | |
| **Intervenor- Defendant.** | ) | |

## INTERVENOR ATLANTIC DIVING SUPPLY INC.'S MEMORANDUM IN SUPPORT OF ITS CROSS-MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD AND RESPONSE TO PLAINTIFF'S MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD

Dated: August 7, 2023

Jamie F. Tabb
Vinson & Elkins L.L.P.
2200 Pennsylvania Avenue, NW
Suite 500 West
Washington, DC 20037
(202) 639-6773
jtabb@velaw.com
*Attorney of Record*

*Of counsel:*
Elizabeth Krabill McIntyre
Leslie Edelstein
Vinson & Elkins L.L.P.

*Attorneys for Atlantic Diving Supply, Inc.*

## TABLE OF CONTENTS

PAGE

I.      INTRODUCTION ................................................................................................. 1

II.     QUESTIONS PRESENTED................................................................................. 2

III.    STATEMENT OF THE CASE............................................................................. 3

IV.     ARGUMENT ....................................................................................................... 8

        A.    Point Blank's OCI Allegations Lack Merit .......................................... 8

            1.    TYR Does Not Have a Biased Ground Rules OCI ................................... 9

                a.    The Exception at FAR 9.505-2(a)(1)(i) ........................................ 12

                b.    The Exception at FAR 9.505-2(a)(3) ............................................ 12

            2.    TYR Does Not Have an Unequal Access to Information OCI ................ 14

            3.    ICE Was Not Required to Document an OCI Analysis ........................... 18

        B.    The RFI Was Not Unduly Restrictive of Competition ......................... 21

        C.    ICE's Evaluation of the RFI Submissions Was Not Flawed ............... 24

        D.    ICE Conducted Adequate Market Research ....................................... 27

        E.    Point Blank is Not Entitled to Permanent Injunctive Relief ............... 30

            1.    Point Blank Has Not Established Irreparable Harm ................................ 30

            2.    The Balancing of the Hardships Weighs Against an Injunction.............. 34

            3.    The Public Interest Weighs Against an Injunction ................................. 35

V.      CONCLUSION................................................................................................... 36

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AAR Manufacturing, Inc. v. United States,*
149 Fed. Cl. 514 (2020) .................................................................... 13

*ABF Freight Sys., Inc. v. United States,*
55 Fed. Cl. 392 (2003) ..................................................................... 21

*Acesfed, LLC v. United States,*
158 Fed. Cl. 529 (2022) .................................................................... 22

*ACI Techs., Inc. v. United States,*
162 Fed. Cl. 39 (2022) ..................................................................... 31

Aetna Gov't Health Plans, Inc., B–254397, *et al.,*
1995 WL 449806 (Comp. Gen. July 27, 1995) ......................................... 9

*Alabama Aircraft Indus., Inc.-Birmingham v. United States,*
83 Fed. Cl. 666 (2008), *rev'd on other grounds,* 586 F.3d 1372 (Fed. Cir. 2009) .................. 11

*Amazon Web Services, Inc. v. United States,*
147 Fed. Cl. 146 (2020) .................................................................... 33

*ARINC Eng'g Servs., LLC v. United States,*
77 Fed. Cl. 196 (2007) ..................................................................... 16

*Assessment & Training Sols. Consulting Corp. v. United States,*
92 Fed. Cl. 722 (2010) ..................................................................... 28

*BAE Sys. Norfolk Ship Repair, Inc. v. United States,*
163 Fed. Cl. 217(2022) .................................................................... 30

*Beta Analytics International, Inc. v. United States,*
61 Fed. Cl. 223 (2004) ................................................................. 20, 21

*CHE Consulting, Inc. v. United States,*
78 Fed. Cl. 380 (2007), *aff'd,* 552 F.3d 1351 (Fed. Cir. 2008) ........................... 23

*Chromalloy San Diego Corp. v. United States,*
145 Fed. Cl. 708 (2019) .................................................................... 31

*Comprehensive Health Servs., LLC v. United States,*
151 Fed. Cl. 200 (2020) .................................................................... 31

*Def. Tech., Inc. v. United States,*
99 Fed. Cl. 103 (2011) .......................................................................... 35

*Found. Health Fed. Servs. v. United States,*
No. 93-1717, 1993 WL 738426 (D.D.C. Sept. 23, 1993) ........................ 31

*G4S Secure Integration LLC v. United States,*
159 Fed. Cl. 249 (2022) ........................................................................ 27

*Global Dynamics, LLC v. United States,*
138 Fed. Cl. 207 (2018) ........................................................................ 36

*Harmonia Holdings Grp. v. United States,*
145 Fed. Cl. 583 (2019) ........................................................................ 28

*Infrastructure Def. Techs., LLC v. United States,*
81 Fed. Cl. 375 (2008) .......................................................................... 21

*Intelligent Waves, LLC. v. United States,*
135 Fed. Cl. 299 (2017) ........................................................................ 36

*Linc Gov't Servs., LLC v. United States,*
96 Fed. Cl. 672 (2010), *abrogated on other grounds by*
*Safeguard Base Operations, LLC v. United States*, 989 F.3d 1326 (Fed. Cir. 2021) .............. 35

*Linc Gov't Servs., LLC v. United States,*
96 Fed. Cl. 672 (2010) .......................................................................... 35

*McVey Co. v. United States,*
111 Fed. Cl. 387 (2013) ........................................................................ 20

*Michael Stapleton Associates, Ltd. v. United States,*
163 Fed. Cl. 297 (2022) ........................................................................ 13

*Mitchco Int'l., Inc. v. United States,*
151 Fed. Cl. 537 (2020) ........................................................................ 34

*Newimar, S.A. v. United States,*
163 Fed. Cl. 240 (2022) ........................................................................ 31

*Obsidian Sols. Grp., LLC v. United States,*
No. 20-1602C, 2021 WL 1688892 (Fed. Cl. Apr. 27, 2021),
*aff'd*, 54 F.4th 1371 (Fed Cir. 2022) .................................................... 31

*OTI America, Inc. v. United States,*
73 Fed. Cl. 758 (2006) .................................................................... 27, 30

*PAI Corp. v. United States*,
    614 F.3d 1347 (Fed. Cir. 2010) ................................................................ 16, 19

*Parcel 49C Ltd. P'ship v. United States*,
    130 Fed. Cl. 109 (2016) ................................................................................ 23

*Raymond Express Int'l, LLC v. United States*,
    120 Fed. Cl. 413 (2015) ................................................................................ 28

*Sierra Mil. Health Servs., Inc. v. United States*,
    58 Fed. Cl. 573 (2003) .................................................................................. 31

*Superlative Techs., Inc.; Atl. Sys. Grp., Inc.*, B-415405, *et al.*,
    2018 WL 585679 (Comp. Gen. Jan. 5, 2018) ...................................... 16, 17

*Tetra-Tech, Inc. v. United States*,
    137 Fed. Cl. 367 (2017) ................................................................................ 26

*Torres Adv. Enter. Sols., LLC v. United States*,
    133 Fed. Cl. 496 (2017) ................................................................................ 36

*Turner Constr. Co. v. United States*,
    645 F.3d 1377 (Fed. Cir. 2011) ........................................................ 9, 14, 19

*XTRA Lease, Inc. v. United States*,
    50 Fed. Cl. 612 (2001) .................................................................................. 22

**Statutes**

28 U.S.C. § 1491(b)(3) ................................................................................... 35

**Regulations**

FAR 9.504(b) ................................................................................................. 19

FAR 9.504(d) .......................................................................................... 19, 20

FAR 9.505-2(a)(1) ...................................................................................... 9, 12

FAR 9.505-2(a)(1)(i) ..................................................................................... 12

FAR 9.505-2(a)(3) .......................................................................................... 12

FAR 9.508 ......................................................................................................... 9

FAR 9.508(c) ................................................................................................. 14

FAR 9.508(e) ................................................................................................. 10

FAR 9.508(f) ................................................................................................................ 10

FAR 10.001(a) .............................................................................................................. 28

FAR 10.001(a)(2) .......................................................................................................... 27

FAR 10.001(b) .............................................................................................................. 30

FAR 10.002(b)(1) .......................................................................................................... 28

FAR 15.201(e) .............................................................................................................. 28

FAR 35.001 ................................................................................................................... 14

**Other Authorities**

Point Blank Enterprises, Inc., USASpending.gov,
    https://www.usaspending.gov/recipient/bb1d39b8-bc8e-f58b-2368-856b3a229506-
    C/latest (last visited August 7, 2023) ..................................................................... 32

U.S. Immigration and Customs Enforcement (ICE),
    www.ice.gov/mission (last visited August 6, 2023) ................................................ 35

I.      **INTRODUCTION**

In its Motion for Judgment on the Administrative Record, Plaintiff Point Blank Enterprises, Inc. ("Point Blank") attempts to paint a picture of a vast conspiracy involving two federal agencies and two companies to run roughshod over procurement laws, ignore conflicts of interest, and prevent Point Blank from being able to sell its products.  In doing so, Point Blank relies on speculation and innuendo, and repeatedly mischaracterizes the information in the record.  The reality is that all of the entities that have roles in Point Blank's protest allegations acted reasonably, responsibly and in accordance with the procurement laws and regulations.

First, the interactions between the Federal Bureau of Investigation ("FBI") and TYR Tactical did not create an organizational conflict of interest ("OCI") for this procurement by the Department of Homeland Security, Immigration and Customs Enforcement ("ICE").  Those interactions took place in connection with TYR's performance as a subcontractor/supplier to Atlantic Diving Supply, Inc. ("ADS"), the Intervenor in this protest and the prime contractor on the FBI contract.  As was anticipated under the contract, the FBI shared a concern with TYR, and TYR then designed an enhancement to its product in response to that concern.  These activities could not have created either a "biased ground rules" or "unequal access to information" OCI.

Second, none of Point Blank's other allegations have merit.  ICE had broad discretion to identify its needs and the requirements necessary to satisfy those needs, and the record shows that ICE acted reasonably in doing so.  ICE thoroughly assessed the body armor samples received in response to its Request for Information ("RFI"), and Point Blank's self-serving assessment of the vendors' Capabilities Statements (which were not the focus of ICE's evaluation) is irrelevant.  Finally, ICE performed market research that was reasonable and appropriate to the circumstances of this acquisition.

Thus, Point Blank's substantive allegations are meritless.  But even if any had merit, Point Blank would not be entitled to a permanent injunction.  Point Blank has failed to provide any evidence of irreparable harm, instead relying exclusively on attorney argument and generic case law.  Moreover, any purported harm to Point Blank from the award of this one-year Blanket Purchase Agreement ("BPA") to ADS is far outweighed by the harms an injunction would cause to the Government.  The evidence in the record establishes that an injunction would put the safety of ICE agents at risk and cause ICE to have to curtail its operations, thereby negatively impacting its mission to preserve national security and public safety.

For all of these reasons, discussed in more detail below, the Court should deny Point Blank's motion for judgment on the administrative record and reject Point Blank's request for a permanent injunction.

## II.    QUESTIONS PRESENTED

1.  Whether Point Blank has demonstrated that TYR, ADS' supplier/subcontractor, had a biased ground rules OCI notwithstanding that TYR did not develop any specifications or requirements for ICE or any other federal agency.

2.  Whether Point Blank has demonstrated that TYR had an unequal access to information OCI notwithstanding that TYR received no advance information from ICE about its requirements, and notwithstanding that any information TYR may have received from the FBI – an entirely separate federal agency – was properly shared during performance of a contract under which TYR was supplying product to the FBI.

3.  Whether Point Blank has demonstrated that ICE acted improperly in not documenting an OCI analysis notwithstanding that Point Blank's novel OCI allegations do not present a

colorable argument that a significant OCI existed such that a requirement to document an analysis was triggered.

4.  Whether Point Blank has demonstrated that ICE's RFI was unduly restrictive of competition notwithstanding that Point Blank's argument would require the Court to substitute Point Blank's opinions for ICE's own judgments about its own needs.

5.  Whether Point Blank has demonstrated that ICE's evaluation of the RFI submissions was technically flawed notwithstanding that the evaluation is adequately documented and was based on an examination of physical samples, not on claims or promises submitted by vendors in their written RFI responses.

6.  Whether Point Blank has demonstrated that ICE failed to conduct adequate market research under the circumstances of this acquisition, notwithstanding that the record reflects that ICE conducted thorough market research.

7.  Whether Point Blank has demonstrated irreparable harm from ICE's actions in the absence of permanent injunctive relief, given that Point Blank has made generalized arguments not supported by facts or evidence of harm.

8.  Whether Point Blank has demonstrated that the balance of hardships and public interest favor permanent injunctive relief, in light of the significant harm an injunction would cause to ICE's ability to protect national security and ensure the safety of its agents.

## III.   STATEMENT OF THE CASE

████████████ is the Director of Research for the FBI's Ballistic Research Facility ("BRF").  Declaration of ████████, Dkt. 33-1 at ¶ 1.  As explained in his declaration, "[i]n August 2020, the FBI entered [into] a five-year contract with ADS, Inc. for the acquisition of soft body armor manufactured by Tyr Tactical."  *Id.* at ¶ 7.  The award was a BPA, No.

15F06720D0001652 (the "FBI contract"), issued under ADS' General Services Administration ("GSA") Schedule Contract, No. GS-07F-5965P.  A copy of the FBI contract is attached here for the Court's reference.  *See* Exhibit A.

This contract required ADS to fill recurring orders for male and female body armor that was NIJ Level IIIA certified.  Ex. A at 14.  Under the contract, meetings between the FBI and the supplier were not only encouraged, but mandated.  Specifically, Section 8.6 of the contract's specifications stated: "FBI and Contractor *shall hold performance meetings* twice a year . . . .  These meetings are to discuss contract performance, assess quality control measures, *address any concerns and resolve issues informally*."  *Id*. at 19 (emphasis added).  Notably, during the first year of performance, the contractor was required to "host a performance meeting at their production facility," which for ADS, was TYR's facility.  *Id.*

In compliance with the terms of the contract, Mr. ▮▮▮▮ met with TYR on or about September 3, 2020 and informed TYR about a concern regarding projectiles skipping off the armor into the wearer's neck.  ▮▮▮▮ Decl., Dkt. 33-1 at ¶ 10; *see also* Declaration of Jason Beck, Dkt. 34-1 at ¶ 6 (noting that "FBI raised its concern about the 'skipping' issue with TYR during a semiannual performance meeting held as part of the FBI contract.").  This was a standard meeting, contemplated by the terms of the FBI contract.  Following the meeting, TYR designed a solution to the skipping problem – ▮▮▮▮▮▮ – within a few weeks.  Beck Decl., Dkt. 34-1 at ¶ 6.  Mr. Beck has stated that the FBI provided no input into how TYR solved the skipping issue, and that TYR received no feedback on its design from the FBI.  *Id.* at ¶ 7.

Once TYR created ▮▮▮▮▮▮, it presented the FBI with prototypes of its solution.  *See* AR 784 ("Ultimately 'as issued' ▮▮▮▮▮ samples were received at [the] BRF . . . .").  The FBI was solely responsible for the testing of these samples, and TYR was not even on-site

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

when the testing was performed.  Beck Decl., Dkt. 34-1 at ¶ 8.  Moreover, TYR did not instruct the FBI on any testing methods.  *Id.*  At this point, the FBI determined that ███████████ successfully defeated the skipping issue.  *See* AR 784 ("testing confirmed the efficacy of the ████████████████████████████████████████████████████").

On August 18, 2021, the FBI and ADS agreed to a contract modification adding the ███████████████████ as an additional component that could be purchased by the FBI.  *See* Exhibit B.  Moreover, as noted in the FBI's August 23, 2022 report titled "Female Body Armor Risk Identification & Mitigation" (the "BRF Report"), ██████████████████████████ ████████████████████████████████████████████████████████████ █████████  AR 785.  At no point during this process did TYR prepare any specifications or testing requirements, and at no point did the FBI discuss future procurement requirements with TYR. Beck Decl., Dkt. 34-1 at ¶ 10.

On August 10, 2022, Mr. ████████ presented his findings at the Women in Federal Law Enforcement ("WIFLE") Annual Leadership Training conference.  Compl. Ex. 1-B, Dkt. 1-1 at 22.[1]  ICE first learned of the skipping hazard from Mr. ████████ presentation.  AR 566. According to Point Blank, it also first learned about the skipping issue in late August 2022. Declaration of Bryant Halstead, Compl. Ex. 2, Dkt. 1-2 at ¶ 4.  On September 22, 2022, the FBI provided Point Blank with video footage from the FBI's testing that identified the skipping hazard.  *Id.* at ¶ 9.  Later, on October 13, 2022, the FBI's Senior Counsel for Information Technology offered to set up a meeting between Point Blank and BRF personnel to discuss the skipping hazard.  Compl. Ex. 1-H, Dkt. 1-1 at 73.  Instead of accepting the meeting, Point Blank

---

[1] No TYR employees were present at the WIFLE conference.  Beck Decl., Dkt. 34-1 at ¶ 11.

████████████████████████████████████████████████████████
████████████████████████████████████████████

refused to meet until the FBI would provide documents that had not been cleared for public release.  *Id.* at 72-73.  Nonetheless, at some point, Point Blank obtained a copy of the BRF Report.  Compl. Ex. 1-A, Dkt. 1-1 at 7-12.

Meanwhile, on August 23, 2022, ███████ of ICE's Office of Firearms and Tactical Programs ("OFTP") received information regarding the skipping hazard from the FBI.  Declaration of ███████, Dkt. 33-2 at ¶¶ 5-6.  In November 2022, Tony Ross, ICE's Contracting Officer, learned about OFTP's new requirement for enhanced ballistic features to protect against the hazard.  Declaration Tony Ross, Dkt. 33-3 at ¶ 8.  At the time, ICE was in the middle of a competitive procurement for soft body armor, and ICE awarded a contract to ADS on or around December 13, 2022.  AR 668.  Aspetto, Inc., an unsuccessful offeror, filed a protest of that award with the Government Accountability Office ("GAO") on January 3, 2023.  AR 667.  On January 30, 2023, in light of the new information regarding the skipping hazard, ICE elected to cancel the solicitation.  AR 773.  ICE's notice of corrective action noted that it had learned of "new issues in the field of body armor affecting the safety of agency law enforcement personnel."  *Id.*  ICE indicated that it planned to conduct additional market research. *Id.*[2]

In addition to having learned about the skipping issue, by early 2023 ICE was also facing significant time constraints, as its current supply of body armor in inventory would be depleted by the end of September.  ███████ Decl., Dkt. 33-2 at ¶ 13; Ross Decl., Dkt. 33-3 at ¶ 18.  In light of the information provided by the FBI, on March 8, 2023 ICE issued an RFI to gain knowledge

---

[2] Point Blank asserts that ICE "was forced" to take corrective action in response to Aspetto's protest.  Dkt. 48-1 at 12 n.3.  However, the GAO protest filings in the record reflect that ICE chose to take corrective action voluntarily.  AR 773-78.

of vendors with the ability to produce and deliver certified NIJ Level IIIA body armor with "enhanced ballistic resistance features."  AR 1.  ICE explained in its internal Market Research Report ("MRR") that its updated Statement of Work ("SOW") was designed to meet the "FBI benchmark standards outlined in the . . . FBI Study," which included "integrated throat ballistic protection in cases of potential bullet projectiles moving upward towards the neck area for female agents and male agents with larger upper body areas."  AR 497.  The MRR further explained that the SOW required the additional protection to be "transferable to the concealable carrier from the overt carrier," given that "[m]any of ICE's law enforcement duties require the wearing of plain clothes and necessitates the use of a concealed carrier."  AR 500.

Aside from providing its findings to ICE, the FBI BRF was not consulted by ICE and had no input into the preparation of ICE's specifications for the current procurement.  ██████ Decl., Dkt. 33-1 at ¶ 12.  Similarly, TYR did not provide any input to ICE regarding its specifications.  Beck Decl., Dkt. 34-1 at ¶ 10.

By this point, several months had passed since Point Blank had learned about the skipping hazard.  Nonetheless, Point Blank apparently declined to design a solution.  Instead, Point Blank responded to the RFI by complaining to ICE about its purported mistreatment by the FBI, and by leveling an outlandish allegation of a "biased ground rules" OCI against TYR.  AR 191-92.  Point Blank also apparently recruited one of its resellers, Aspetto, to include the same message, nearly word-for-word, in its own submission to ICE.  AR 655-56.  In doing so, Point Blank presumably hoped to convince ICE that its concerns were widespread throughout

industry.[3]   Notably, SRT Supply, another Point Blank reseller, did not include any OCI allegations in its Capabilities Statement.  AR 478-84.

After evaluating the submitted product samples and documenting its conclusion that only ADS, providing TYR body armor, met its requirements (*see* AR 485-86), ICE executed a Limited Sources Justification ("J&A") on May 3, 2023.  AR 518-24.  The J&A explained that the BPA would have a 12-month ordering period, and that ICE planned to initiate a competitive acquisition during that ordering period.  AR 519, 523.  Notably, ICE also included the following note in its MRR: "During the POP [Period of Performance] of the BPA, the industry will be afforded an opportunity to conduct further testing to meet OFTP's needs in offering body armor that addresses the skipping hazard of potential projectiles for female agents."  AR 504.

ICE awarded a sole source BPA, No. 70CMSW23A00000001, to ADS on May 17, 2023. AR 542-62.  ICE has since issued two call orders against the BPA, Nos. 70CMSW23FC0000057 and 70CMSW23FC0000073, with required deliveries by February 2024 and May 2024, respectively.  AR 585-89, 615-21.

## IV.   ARGUMENT

### A.   Point Blank's OCI Allegations Lack Merit

Point Blank alleges that ICE's award of the BPA was inconsistent with the FAR because TYR suffered from two types of OCIs – biased ground rules and unequal access to information. In doing so, Point Blank fails to establish the "hard facts" necessary to establish any potential OCI, and its allegations are also legally deficient.  Moreover, since there was no substantive OCI

---

[3] Point Blank now comically tries the same strategy with this Court, dramatically noting that "*two offerors*" notified ICE of OCI concerns.  Dkt. 48-1 at 15, 18, 20 (emphasis in original).

issue in this procurement, the Contracting Officer was not required to document his analysis in the procurement record.

### 1.    TYR Does Not Have a Biased Ground Rules OCI

As explained by the Court of Appeals, "[t]he biased ground rules category of OCIs focuses on the concerns that a company may, ***by participating in the process of setting procurement ground rules***, have special knowledge of the agency's future requirements that may skew the competition in its favor." *Turner Constr. Co. v. United States*, 645 F.3d 1377, 1382 (Fed. Cir. 2011) (emphasis added).  Put another way, if a contractor is tasked with preparing the specifications or requirements for a future procurement, that contractor should not be permitted to compete in that future procurement, given the possibility that it could have drafted the specifications to favor its own products.  *See Aetna Gov't Health Plans, Inc.,* B–254397, *et al*., 1995 WL 449806, at *8–9 (Comp. Gen. July 27, 1995) ("In these 'biased ground rules' cases, the primary concern is that the firm could skew the competition, whether intentionally or not, in favor of itself.").  Thus, a basic ingredient of a biased ground rules OCI is a contractor's knowledge and awareness that it is preparing the "ground rules" for a future procurement, as it is that awareness that creates a concern regarding bias.

This requirement is reflected in FAR 9.505-2(a)(1), relied on by Point Blank: "If a contractor prepares and furnishes complete specifications covering nondevelopmental items, ***to be used in a competitive acquisition***, that contractor shall not be allowed to furnish these items, either as a prime contractor or as a subcontractor, for a reasonable period of time . . . ." (emphasis added).  Similarly, FAR 9.508 provides examples illustrating various OCI situations, including biased ground rules OCIs.  Paragraphs (e) and (f) are especially relevant to this point:

> Before an acquisition for information technology is conducted, Company A is awarded a contract to prepare data system specifications and equipment performance criteria **_to be used as the basis for the equipment competition_**. Since the specifications are the basis for selection of commercial hardware, a potential conflict of interest exists. Company A should be excluded from the initial follow-on information technology hardware acquisition.

FAR 9.508(e) (emphasis added).

> Company A receives a contract to define the detailed performance characteristics an agency will require for purchasing rocket fuels. Company A has not developed the particular fuels. When the definition contract is awarded, **_it is clear to both parties that the agency will use the performance characteristics arrived at to choose competitively a contractor to develop or produce the fuels_**. Company A may not be awarded this follow-on contract.

FAR 9.508(f) (emphasis added).  In sum, if a contractor does not know that its work will be used to set the "ground rules" for a future procurement, there is no opportunity for bias, and there can be no OCI.

Here, there is no evidence that TYR even prepared and delivered specifications to the FBI, let alone specifications to be used in a competitive acquisition.  Point Blank repeatedly asserts that "there is no reasonable dispute" that TYR prepared specifications for the ballistic resistant fold that was featured in ICE's RFI.  Dkt. 48-1 at 19, 20.[4]  In fact, there **_is_** a dispute on that issue, because there is no evidence in the record that TYR prepared or delivered any such specifications, and TYR's CEO has explicitly stated that TYR did not.  *See* Beck Decl., Dkt. 34-1 at ¶ 10.  Instead, TYR developed and delivered a new version of its body armor with enhanced ballistic features.  Developing a solution is not tantamount to preparing specifications.  Point Blank apparently believes that repeating an unsupported assertion over and over somehow makes it true.

---

[4] Citations to page numbers of prior briefs are to the ECF pagination at the top of the page.

But more importantly, even if TYR's work for the FBI could be characterized as the preparation and furnishing of specifications (which it cannot), there is no evidence that TYR was aware that it was performing that work to set the ground rules for a future acquisition by ICE – a entirely separate federal agency.  Indeed, Mr. Beck has stated that "[t]he FBI did not discuss future procurement requirements with TYR" and "did not make any statements to TYR regarding future procurements."  Dkt. 34-1 at ¶ 9.  TYR merely designed a solution to a concern raised by the FBI in connection with an ongoing supply contract.  There is no logical reason why TYR should or could have known that ICE would adopt aspects of TYR's solution as requirements for its acquisition three years later.   And because TYR did not have that knowledge, there was no opportunity for bias, and there was no OCI.

For these reasons, Point Blank's novel OCI theory must fail.  If the Court finds that the facts here constitute a biased ground rules OCI, it would be extending the biased ground rules concept far beyond what it is intended to cover.  The Court would essentially be establishing a precedent whereby a contractor delivering a solution to one agency could unwittingly be conflicted out of a future contract because another agency later decides that it wants to acquire that same solution.

Put simply, TYR's work for the FBI did not involve preparing specifications for ICE's acquisition, and for that reason alone, TYR cannot have a biased ground rules OCI.  *See Alabama Aircraft Indus., Inc.-Birmingham v. United States*, 83 Fed. Cl. 666, 687 (2008), *rev'd on other grounds,* 586 F.3d 1372 (Fed. Cir. 2009) ("[T]here is no evidence in the administrative record indicating that Boeing or L–3 was involved in either drafting the statement of work or establishing the specifications for this procurement.  Accordingly, there are no 'hard facts' in the administrative record supporting [protester's] claim of a 'biased ground rules' OCI.").

### a.      The Exception at FAR 9.505-2(a)(1)(i)

Moreover, even if TYR had furnished specifications to be used in ICE's acquisition (which it did not), at least two of the exceptions to the biased ground rules prohibition in the FAR would be applicable here.

As ADS explained in its prior brief, the FAR states that the restriction at Section 9.505-2(a)(1) "shall not apply" to "[c]ontractors that furnish at Government request specifications or data regarding a product they provide, even though the specifications or data may have been paid for separately or in the price of the product." FAR 9.505-2(a)(1)(i). This exception captures the exact (hypothetical) circumstance that Point Blank describes in its protest – TYR furnishing specifications for the enhanced ballistic features it provided to the FBI.

Point Blank argues that the exception is inapplicable because "[t]he FBI contract with ADS was for the purchase of TYR's existing commercial product, *not the enhanced product*." Dkt. 48-1 at 23 (emphasis in original). This is incorrect. The FBI's BRF Report clearly states: "The efficacy of this product enhancement led the FBI to procure a new set of body armor for every female Special Agent in the FBI. The final sets should be delivered by the end of calendar year 2022 completing this protection enhancement." AR 785. As further evidence, the FBI's contract modification showing the addition of ███████████████████████████ to the contract is attached as Exhibit B. Thus, even if TYR provided specifications or data to the FBI regarding its enhanced product (which it did not), the biased ground rules restriction at FAR 9.505-2(a)(1) would be inapplicable.

### b.      The Exception at FAR 9.505-2(a)(3)

In addition, even under the fictional scenario Point Blank has described, the "development exception" at FAR 9.505-2(a)(3) would also be applicable. There is no dispute

that TYR designed and developed the enhanced features at issue in this protest.  *See* Beck Decl., Dkt. 34-1 at ¶ 6.  Yet Point Blank argues that the exception cannot apply because ADS' contract with the FBI was a supply contract, and not a development contract.  Dkt. 48-1 at 22.  Point Blank's argument is overly formulaic and ignores the purpose of the development exception.  FAR 9.505-2(a)(3) explains that firms that participate in development work "can frequently start production earlier and more knowledgeably than firms that did not participate in the development, and this can affect the time and quality of production, both of which are important to the Government."  In other words, the purpose of the development exception is to ensure that the benefits of contracting with such firms remain available to the Government, notwithstanding the biased ground rules restriction.

Point Blank cites *AAR Manufacturing, Inc. v. United States*, 149 Fed. Cl. 514 (2020), for the proposition that "the development and design exception applies when a contractor participates in design and development work under a contract and then competes in a follow-on competition for that same program."  Dkt. 48-1 at 21-22.[5]  While those may have been the circumstances in the *AAR* case, there is nothing in the Court's decision limiting the exception to situations in which the contractor previously performed on a "development contract."  Indeed, the primary focus of the Court's inquiry in *AAR* was on the nature of the contractor's prior work – i.e., whether the prior work could be considered "development and design."  *See AAR Mfg. Inc.,* 149 Fed. Cl. at 525-28.[6]

---

[5] Point Blank also cites *Michael Stapleton Associates, Ltd. v. United States*, 163 Fed. Cl. 297 (2022), but the discussion in that case focused on whether the development exception could apply to service contracts, an issue irrelevant to this protest.

[6] Notably, the Court criticized the protester for asserting that work to "turn an existing product into a new, improved model" could not constitute "development and design."  *Id.* at 526.  The

Thus, the application of the development exception turns not on whether a prior contract was a "development contract," but rather on whether the contractor performed design and development work for the product or system at issue. *See id.* at 527 ("Taber's work went beyond merely writing Solicitation documents; Taber's expertise and experience were core elements of the pallet's development and design."). This is confirmed by the example at FAR 9.508(c): "Company A develops new electronic equipment and, as a result of this development, prepares specifications. Company A may supply the equipment." Point Blank claims that TYR has a biased ground rules OCI because it allegedly prepared and provided specifications for product enhancements that TYR itself designed and developed. Even if Point Blank were correct (which it is not), the example at FAR 9.508(c) describes this exact scenario, and the development exception therefore would apply.

### 2.    TYR Does Not Have an Unequal Access to Information OCI

Perhaps sensing the weaknesses in its baseless biased ground rules allegation, Point Blank now argues, for the first time, that TYR also has an "unequal access to information" OCI. *See* Dkt. 48-1 at 23-24. An unequal access OCI "can occur when a company has access to nonpublic information in performing a government contract that may give it a competitive advantage in a later competition for a government contract." *Turner Constr.*, 645 F.3d at 1382.[7]

---

Court provided the following analogy: "AAR would not credit Apple with 'development and design' work to design an iPhone 4S from an iPhone 4, for example, despite the improvements and greater functionality of the former." *Id.* The Court then noted that the definition of "development" at FAR 35.001 includes the "use of . . . technical knowledge" to improve of an existing product. *Id.* at 527. This is exactly the work that TYR conducted in connection with the FBI contract – it created a new, improved version of its existing body armor with enhanced features.

[7] In its brief, Point Blank conveniently ignores the "in performing a government contract" element, as admitting that TYR's work for the FBI was in connection with a government contract

Point Blank belatedly makes this argument now, even though it is based on information in the same BRF Report that Point Blank has had in its possession for months.  *See* Dkt. 48-1 at 23-24.[8]

The crux of Point Blank's unequal access allegation is that the FBI informed TYR about the skipping hazard before informing Point Blank and other industry participants.  Dkt. 48-1 at 24.  Of course, the reason why the FBI informed TYR about the issue was because TYR was supplying armor to the FBI at the time the FBI discovered the issue.  *See* BRF Report, AR 780 at n.1 ("Tyr Tactical is the current contract provider of FBI soft body armor . . . ."); ▬▬▬ Decl., Dkt. 33-1 at ¶ 7 ("In August 2020, the FBI entered a five-year contract with ADS, Inc. for the acquisition of soft body armor manufactured by Tyr Tactical."); Beck Decl., Dkt. 34-1 at ¶ 6 ("[T]he FBI raised its concern about the 'skipping' issue with TYR during a semiannual performance meeting held as part of the FBI contract.  The purpose of the semiannual meetings is to discuss performance and resolve any concerns informally.").  *See also* Ex. A at 19 (copy of FBI contract specifications showing requirement for performance meetings at Section 8.6).[9]

---

would run counter to Point Blank's baseless theory that the FBI and TYR were nefariously engaged in "extracontractual" work.  *See* Dkt. 48-1 at 19.

[8] Point Blank claims that its allegation is also based on new revelations in ▬▬▬ declaration, which was attached to the Government's July 7, 2023 Response to Point Blank's Motion for a Preliminary Injunction.  But that declaration merely rehashes what Point Blank has previously alleged – that the FBI identified the skipping issue in 2020 and approached TYR about a solution.  *See* Dkt. 1 at 4-5; Dkt. 27-1 at 6-8.

[9] The FBI contract stated that the performance meetings would be held with FBI and the "Contractor," which was ADS.  However, since TYR was the manufacturer of the body armor, TYR necessarily participated in those meetings, given the focus on performance and quality control.  Indeed, Section 8.6 of the contract specifications required a performance meeting during the first year of performance to take place at the Contractor's production facility, which in this case would be TYR's facility.  *See* Ex. A at 19.

Given the newly-discovered safety risk, the FBI understandably wanted a solution that it could purchase immediately under its existing body armor contract with ADS.  As discussed previously, TYR was able to quickly develop a solution, and the FBI thereafter purchased TYR's enhanced product under that same contract.  *See* AR 785; Ex. B (FBI contract modification). ICE now desires to purchase a product with the same enhancements.

These facts do not establish the existence of an unequal access OCI.  It is well-established that the "mere existence of a prior or current contractual relationship between a contracting agency and a firm does not create an unfair competitive advantage, and an agency is not required to compensate for every competitive advantage gleaned by a potential offeror's prior performance of a particular requirement."  *PAI Corp. v. United States*, 614 F.3d 1347, 1353 (Fed. Cir. 2010) (quoting *ARINC Eng'g Servs., LLC v. United States*, 77 Fed. Cl. 196, 203 (2007)). *See also Superlative Techs., Inc.; Atl. Sys. Grp., Inc.*, B-415405, *et al.*, 2018 WL 585679 at *5 (Comp. Gen. Jan. 5, 2018) ("It is well settled that an offeror may possess unique information, advantages, and capabilities due to its prior experience under a government contract-either as an incumbent contractor or otherwise-and the government is not necessarily required to equalize competition to compensate for such an advantage, unless there is evidence of preferential treatment or other improper action.").

The FBI's sharing of the information regarding the skipping threat with TYR was eminently reasonable, given TYR's status as the current supplier of body armor to the FBI and the FBI's need for an immediate solution.[10]  Thus, any informational advantage acquired by TYR

---

[10] Point Blank also claims that TYR obtained "feedback from the FBI via the iterative process" when developing its solution to the skipping hazard.  Dkt. 48-1 at 24.  There is no evidence in the record that the FBI provided any "feedback" to TYR, and Mr. Beck has explicitly stated that the FBI did not.  *See* Dkt. 34-1 at ¶ 7.  Thus, the language in the BRF Report regarding "numerous

in connection with its prior work for the FBI was a "normally occurring advantage" that was a product of the FBI contract, and ICE (an entirely separate federal agency) was not required to take action to compensate for such an advantage.  *Superlative Techs., supra.*  Moreover, the information allegedly furnished by the FBI certainly did not give ADS and TYR advance knowledge of ***ICE's*** requirements or preferences.  Indeed, Point Blank has not cited any authority for the proposition advanced in its protest – that one agency's sharing of information can create an unequal access OCI for a procurement conducted by an entirely separate federal agency.  Moreover, Point Blank's complaints regarding the FBI's purported "endorsement" of TYR's product are irrelevant, as the cited statements have nothing to do with the sharing of information with TYR.  *See* Dkt. 48-1 at 24.

Point Blank's unequal access argument is particularly eyebrow-raising, given that Point Blank turned down the opportunity to learn more information from the FBI in the fall of 2022. *See* Compl. Ex. 1-H, Dkt. 1-1 at 72-73.  Thus, any purported informational deficiency experienced by Point Blank is, at least in part, self-inflicted.  Moreover, Point Blank itself has stated that it learned of the skipping issue in August 2022, and received testing data from the FBI in September 2022.  *See* Halstead Decl., Compl. Ex. 2, Dkt. 1-2 at ¶¶ 4, 9.  Thus, Point Blank had seven months prior to the release of ICE's March 2023 RFI to design a solution to the skipping hazard.[11]  Moreover, Point Blank also obtained a copy of the BRF Report (*see* Compl.

---

iterations" (AR 783) is not consistent with Mr. Beck's recollection.  But regardless, even if the FBI had provided feedback to TYR on its solution, that also would have been a normal interaction under the FBI contract, which required the parties to "resolve issues informally."  Ex. A at 19.  Any such feedback was not evidence of "partiality or preferential treatment," as Point Blank alleges.  Dkt. 48-1 at 24.

[11] Mr. Beck has stated that TYR designed its solution to the skipping issue within a few weeks. Dkt. 34-1 at ¶ 6.

Ex. 1-A, Dkt. 1-1 at 7-12), and clearly had the Report prior to the submission of its March 23, 2023 capability statement, as its cover letter references ████████████████████████████████ ████ (which are discussed in the BRF Report) by name.  *See* AR 191-92.

Finally, Point Blank mentions, in passing, the following statement from Mr. ████████ declaration: "It is my belief that a solution integrated into the armor package could not be removed or discarded easily by the wearer."  Dkt. 48-1 at 23 (quoting ██████ Decl., Dkt. 33-1 at ¶ 11).  Notably, Mr. ████████ does not state that he shared this belief with TYR, and Mr. Beck has stated that "[t]he FBI provided no input into how TYR solved the skipping issue."  Dkt. 34-1 at ¶ 7.  But even if Mr. ██████ had shared that information, it would have, at most, given TYR insight into the *FBI's* desired solution, not *ICE's* future requirements.  Like the information about the skipping issue itself, information regarding Mr. ████████ preferences would be information legitimately obtained in connection with TYR's prior experience under a government contract, and not evidence of preferential treatment or other improper action.  Moreover, given Point Blank's experience in the body armor industry, the need for an integrated solution should have been self-evident, given that agents often go without external, ancillary equipment.  *See* Tr. at 36:19-25, 37:1-6.[12]

### 3.      ICE Was Not Required to Document an OCI Analysis

Finally, Point Blank alleges that ICE failed to comply with a procedural requirement of the FAR because the Administrative Record does not include any documentation that the

---

[12] This citation to the transcript ("Tr.") is to the transcript of the July 11, 2023 oral argument on Point Blank's motion for a preliminary injunction.  Dkt. 36.

Contracting Officer assessed any alleged OCIs.  Dkt. 48-1 at 25-27.[13]  As discussed previously, "[a]lthough the FAR requires a contracting officer to identify and evaluate potential conflicts in the early stages of the acquisition process, § 9.504(a) does not require that this preliminary analysis be documented in writing."  *Turner Constr.*, 645 F.3d at 1386.  Put another way, "the contracting officer is not required to document in writing or submit for approval a plan to neutralize apparent or potential conflicts, which in her discretion and judgment are deemed not to be significant."  *PAI*, 614 F.3d at 1353.  Moreover, the contracting officer has "considerable discretion in determining whether a conflict is significant."  *Id.* at 1352.  *See also* FAR 9.504(d) ("The contracting officer's judgment need be formally documented only when a substantive issue concerning potential organizational conflict of interest exists.").

Notwithstanding this black letter law, Point Blank claims that "the AR must include some evidence the Contracting Officer considered the potential OCIs and determined they were not significant."  Dkt. 48-1 at 25.  As support for this assertion, Point Blank cites *PAI Corp.*, discussed *supra*.  While the contracting officer in that case did prepare a written memorandum noting her conclusion that no significant potential conflict existed (614 F.3d at 1353), the Court of Appeals did *not* hold that the contracting officer was *required* to complete that memorandum. In fact, the Court stated the opposite, as discussed above.

Similarly, in *McVey Co. v. United States*, the record did include documentation of the contracting officer's analysis, which was prepared during post-award bid protest proceedings.

---

[13] Point Blank does acknowledge the Government's representation that the Contracting Officer conferred with agency counsel regarding Point Blank's OCI allegations.  *See* Dkt. 33 at 14 n.5. In doing so, the Contracting Officer acted appropriately in fulfilling his duties under the FAR. *See* FAR 9.504(b) ("Contracting officers should obtain the advice of counsel . . . in evaluating potential conflicts . . . .").

111 Fed. Cl. 387, 409-10 (2013). However, the Court explicitly stated that "to the extent that [the contracting officer] acted within her discretion in determining that no significant conflict of interest existed, no documentation was required." *Id.* at 407. Moreover, the Court went out of its way to note that "even if the [post-award] documentation had not been created, plaintiff has failed to introduce any evidence sufficient to overcome 'the presumption of regularity and good faith' respecting the contracting officer's organizational conflict of interest review." *Id.* at 410.

On this point, the Court's decision in *Beta Analytics International, Inc. v. United States*, 61 Fed. Cl. 223 (2004), is instructive. In that case, the Court acknowledged that "nothing in the record reflects whether [an OCI] review . . . took place." *Id.* at 227. However, citing the clear statement in FAR 9.504(d) regarding the requirement for documentation only "when a substantive issue concerning potential organizational conflict of interest exists," the Court noted: "Given the presumption of regularity and good faith, a heavy burden rests upon [the protester] to demonstrate that the absence of documentation reflects a failure to perform the organizational conflict of interest review." *Beta Analytics,* 61 Fed. Cl. at 228. The Court explained that something "more than the mere absence of an explanation" would be needed in order to compel an explanation from the agency. *Id.* Otherwise, "the Court would be substituting its own documentation policy in place of the one contained in the FAR." *Id.* Therefore, the Court went on to independently consider whether the protester had presented evidence suggesting that the agency's undocumented OCI determination was arbitrary and capricious. The Court concluded as follows:

> [Plaintiff] has failed to present any evidence suggesting that the agency's conflict of interest determination was arbitrary and capricious, and thus has not overcome the presumption of regularity. This Court must thus presume the contracting officer executed his duties in the regular manner and in good faith.

> ***Therefore, because 48 C.F.R. § 9.504(d) states that the
> contracting officer need not make an official notation if he does
> not believe that there is a conflict of interest, this Court must
> assume that the contracting officer not only performed the
> conflict of interest review, but that he did not discover any
> conflicts.*** 48 C.F.R. § 9.504(d) (2003); *see also* 48 C.F.R. §
> 9.506(b) (2003) (stating that a contracting officer need not put
> anything in writing unless he decides that "a particular acquisition
> involves a significant potential organizational conflict of interest").

*Id.* (emphasis added).

For all of the reasons discussed in Sections IV(a)(1) and IV(a)(2) above, there is no
significant conflict of interest concern regarding this procurement.  Therefore, the Contracting
Officer's determination that no significant conflict existed was reasonable, and no documentation
of that determination was required.  Like the Court in *Beta Analytics*, the Court should decline
Point Blank's invitation to "substitut[e] its own documentation policy in place of the one
contained in the FAR."  *Beta Analytics,* 61 Fed. Cl. at 228.

### B.      The RFI Was Not Unduly Restrictive of Competition

Point Blank next alleges that the requirements in ICE's RFI are unduly restrictive
because they are not necessary to satisfy ICE's needs.  Dkt. 48-1 at 27-32.  In doing so, Point
Blank would have the Court substitute Point Blank's own assessment of ICE's needs for that of
ICE itself.  The Court should decline Point Blank's invitation.

Agencies are afforded significant discretion in determining their minimum needs and the
best way to satisfy those needs.  *See Infrastructure Def. Techs., LLC v. United States*, 81 Fed. Cl.
375, 393 (2008) (holding that an agency's determination of its own needs is within the agency's
"broad discretion" and is "not for this court to second guess."); *ABF Freight Sys., Inc. v. United
States*, 55 Fed. Cl. 392, 409 n.13 (2003) ("The law is well-settled that the determination of an
agency's procurement needs and the best method for accommodating them are matters primarily

with the agency's discretion."). *See also XTRA Lease, Inc. v. United States*, 50 Fed. Cl. 612, 625 (2001) ("The determination of an agency's minimum needs is a matter within the broad discretion of agency officials. It is not the duty of the court to second guess such determinations.") (internal citations omitted).

Point Blank first takes issue with the RFI requirement for body armor to be "tested by a U.S. Federal Government ballistics testing facility to meet or exceed . . . enhanced ballistic resistance requirements." Dkt. 48-1 at 28 (citing AR 8). This is an odd argument for Point Blank to make, as ICE ████████████████████████████████████████ this requirement. *See* AR 485 (third row on chart). In other words, ICE either waived or relaxed the requirement for Point Blank. Thus, to the extent that Point Blank argues that this requirement is unduly burdensome or otherwise unfair to competitors, Point Blank fails to demonstrate how it was prejudiced. *Acesfed, LLC v. United States*, 158 Fed. Cl. 529, 547 (2022) (holding no prejudice because, even if the agency's actions were improper, plaintiff failed to demonstrate how the improper actions impacted its evaluation).

Point Blank next repeats the arguments it made in its Motion for Preliminary Injunction, challenging the four requirements that Point Blank failed to satisfy that are discussed in the J&A. The key requirement, of course, is the "internal projectile trap." *See* AR 10 ("Front ballistic panels shall have internal projectile trap along top ridge of panel to prevent projectiles from skipping/ricocheting up towards neck area when shot at upward angles between 32 degrees to 43 degrees."). Point Blank questions why the projectile trap must be internal – i.e., why ICE needed an integrated solution. Dkt. 48-1 at 30. This issue was discussed at length in the prior round of briefs, and the record includes a substantial amount of information justifying the need for an integrated solution. *See* AR 500 ("Many of ICE's law enforcement duties require the wearing of

plain clothes and necessitates the use of a concealed carrier.  ICE requires the same level of protection from this specific 'skipping' hazard when wearing the concealed carrier as when wearing the overt carrier."); AR 566 (same); *see also* ███ Decl., Dkt. 33-2 at ¶¶ 9-11.

Nonetheless, Point Blank continues to quibble with ICE's judgment regarding the best way to protect its agents.  Point Blank argues that the BRF testing that identified the skipping hazard used an outer tactical carrier, and not a concealed carrier.  Dkt. 48-1 at 30.  Even if Point Blank is correct, this fact does not call into question ICE's determination that it needed to ensure its agents are protected against the skipping threat when transferring the armor from an overt carrier to a concealed carrier.  *See* AR 8.  According to Point Blank's logic, ICE should have assumed that the skipping issue was nonexistent when using a concealed carrier, thus potentially putting agents' lives in danger.  It was obviously within ICE's broad discretion to take every precaution to ensure the safety of its agents, including by requiring an integrated solution that could not be removed.  *See Parcel 49C Ltd. P'ship v. United States*, 130 Fed. Cl. 109, 126-27 (2016) ("re-examining [the agency's public safety requirements] is not the role of this Court when determining whether the [agency's] requirements unduly restrict competition"); *CHE Consulting, Inc. v. United States*, 78 Fed. Cl. 380, 387 (2007), *aff'd*, 552 F.3d 1351 (Fed. Cir. 2008) ("where acquisitions concerning national defense and security are involved, the Court must afford even wider deference to the agency").

The bottom line is that ICE reasonably determined that the enhanced ballistic protection needed to be built in to the armor itself, and Point Blank's external, removable throat/collar protector did not satisfy that requirement.  The fact that Point Blank's throat/collar protector ███ ████████████████████████████████████████████ is irrelevant.  *See* AR 486 (fifth and sixth rows from the bottom of chart).  Moreover, since ICE's requirement for an

████████████████████████████████████████████████

integrated projectile trap was reasonable, Point Blank's complaints about the restriction on laser cut webbing and the cummerbund connector are moot.  *See* Dkt. 48-1 at 31-32.

C.      **ICE's Evaluation of the RFI Submissions Was Not Flawed**

Point Blank next argues that the record does not support ICE's conclusion that the TYR armor met the minimum requirements outlined in the RFI, or its conclusion that Point Blank's armor ██████████████████████ minimum requirements.  Dkt. 48-1 at 32-33.  These arguments are without merit.

First, Point Blank ignores the fact that ICE's evaluation process focused on the ***soft body armor product samples*** submitted by the interested vendors, and not the vendors' written submissions.  The RFI required interested vendors to submit "one (1) size Adult Male Large Level IIIA *and* one (1) Adult Female Large Soft Body Armor Kit with enhanced ballistic resistance features along with hardcopy of armor test data proving armor meets or exceeds NIJ standards."  AR 2 (emphasis in original).  In addition, the RFI stated, "Interested parties are invited to provide a Capabilities Statement along with product language."  *Id.*  Such statement could be no more than five pages long.  *Id.*  The RFI did not require vendors' written Capabilities Statements to address each minimum requirement listed in the RFI.  In fact, the RFI did not include any particular requirement for the content of the written Capabilities Statement, aside from a general statement to provide information "as to technical capabilities."  *Id.*

Point Blank's arguments about ICE's technical conclusions fundamentally miss the point that ICE assessed product samples.[14]  Ignoring the obvious fact that most or all of the RFI's

---

[14] The physical armor samples are understandably not in the administrative record before this Court.  Perhaps recognizing that the samples themselves would belie its entire technical argument, Point Blank artfully frames its argument as a criticism of the sufficiency of the "documentation in the AR" to support ICE's technical conclusions.  *See* Dkt. 48-1 at 26.  And

minimum requirements for the armor were readily observable to ICE based on an examination of the tangible samples, Point Blank incorrectly points to ADS' written submission as the only possible support for whether TYR's soft armor met the minimum requirements, and then claims that ICE's conclusions were unreasonable because that written submission did not explicitly repeat each minimum requirement.  *See* Dkt. 48-1 at 26; Dkt. 48-3 at 2-3.  In the same vein, Point Blank cites its own written submission as purported proof that its product sample met the requirements that Point Blank claims it met, even though ICE found that Point Blank ███████ ████████ minimum requirements.  *See* Dkt. 48-1 at 26; Dkt. 48-3 at 2-3; AR 485-86.  By Point Blank's self-serving logic, a vendor should have been credited for simply copying and pasting each minimum requirement into its Capabilities Statement even if its submitted sample did not meet each requirement to ICE's satisfaction.  The reality is that ICE was instead focused on assessing the tangible samples of soft body armor in order to determine whether the samples satisfied ICE's requirements.

Second, Point Blank is factually wrong that the "AR does not include any evidence that the TYR product actually meets ██████ of the stated requirements."  Dkt. 48-1 at 26.  ICE's Evaluation Abstract is such evidence.  In it, ICE clearly identified whether each offeror passed or failed each minimum requirement in the RFI.  AR 485-86.  These were check-the-box minimum requirements for the armor the Agency was seeking (and, notably, had not even committed to buying), and most or all of them were capable of visual observation and manual measurement based on a thorough examination of the samples themselves.  The Evaluation Abstract shows

---

conveniently, Point Blank then invites the Court to substitute Point Blank's technical assessments for those of the Agency.  The Court should not indulge Point Blank's self-serving attempts to cast doubt on this RFI process through these methods.

that ICE confirmed whether each vendor's sample met those minimum requirements on a pass/fail basis.  No further documentation was required.  In fact, consistent with the market research purpose of the RFI, the RFI did not include "evaluation criteria," and there is no expectation in an RFI process that the agency will prepare a detailed technical evaluation report as it might under an RFP with detailed "Section M" evaluation criteria.  Point Blank is attempting to substitute its own technical conclusions about each vendor's RFI submission for those of the Government.

Third, Point Blank takes issue with ADS' response to the requirement in the RFI's draft SOW for "all testing data, NIJ, and US Federal Government ballistic testing facility."  Dkt. No. 48-1 at 26; *see* AR 9.  ██████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

█████████████████████████████████████████████ ICE reasonably accepted this as sufficient, and, in any case, the RFI was merely a request for information with no promise of any procurement, not an RFP with formalistic submission and evaluation requirements. Moreover, to the extent that Point Blank is alleging that ICE waived or relaxed this requirement for ADS, the record shows that ICE did the same for Point Blank, as discussed in Section IV.B above.  *See* AR 485 (third row).  *Tetra-Tech, Inc. v. United States*, 137 Fed. Cl. 367, 386 (2017) (finding no prejudice when "plaintiff fails to show how it was prejudiced by the alleged relaxation of the evaluation criteria because, if such a relaxation occurred, it benefitted along with [the awardee].").[15]

---

[15] To the extent that Point Blank suggests that ICE waived this requirement for *ADS only*, Point Blank's argument fails.  There is no evidence that Point Blank would have submitted anything

████████████████████████████████████████████████████████████████

Finally, Point Blank's technical arguments fail because Point Blank's own Capabilities Statement acknowledges that its product does not satisfy *all* of the Agency's minimum requirements.  Point Blank conspicuously argues that its soft body armor actually had ████ ████ of the features that ICE determined it did not have.  *See* Dkt. 48-1 at 26.  But ICE determined that Point Blank's product failed to meet ██████████████████████ AR 485-86. Most importantly, Point Blank does not cite any evidence that it satisfied the requirement that the "[f]ront panel shall have elastic pouch with ballistic fold along top ridge."  *See* Dkt. 48-3 at 2-3. Instead, Point Blank's Capabilities Statement admits that its product ██████████████████ ████████████████████████ AR 194 (emphasis added).  Thus, even if Point Blank's allegations about ICE's supposedly flawed technical conclusions were true (which they are not), Point Blank did not provide a product with the enhanced ballistic features that ICE sought, and thus it cannot show any prejudice from ICE's technical conclusions about either TYR's or Point Blank's products (even if those conclusions were unreasonable, which they were not).  *See OTI America, Inc. v. United States*, 73 Fed. Cl. 758, 770-71 (2006) (protester could not show prejudice when it did not meet minimum testing standards because there was no possibility the protester would have been in line to receive a contract award).

### D.     ICE Conducted Adequate Market Research

ICE had significant discretion regarding the scope and quantity of its market research. As discussed in ADS' prior brief, market research must be "appropriate to the circumstances." FAR 10.001(a)(2).   The FAR acknowledges that "[t]he extent of market research will vary,

---

different if it had known about the alleged waiver or that it would have been in line for an award but for the waiver.  Thus, Point Blank did not suffer any prejudice.  *See G4S Secure Integration LLC v. United States*, 159 Fed. Cl. 249, 260-61 at n.5 (2022) (citing several GAO cases which require evidence that "protester would have altered its proposal to its competitive advantage had it been given the opportunity to respond to the altered requirements").

████████████████████████████████████████████████████████
████████████████████████████████████

depending on such factors as urgency, estimated dollar value, complexity, and past experience." FAR 10.002(b)(1).  How an agency chooses to fulfill these requirements is afforded significant discretion.  *See Harmonia Holdings Grp. v. United States*, 145 Fed. Cl. 583, 595 (2019) ("an agency is afforded 'substantial discretion in the scope and manner of conducting market research'") (quoting *Raymond Express Int'l, LLC v. United States*, 120 Fed. Cl. 413, 431 (2015)); *Assessment & Training Sols. Consulting Corp. v. United States*, 92 Fed. Cl. 722, 731 (2010) ("the Contracting Officer had discretion under the relevant regulations to conduct market research 'appropriate to the circumstances'" (citing FAR 10.001(a)).

As discussed in ADS' prior brief, ICE's market research was thorough.  *See* Dkt. 34 at 22.  ICE assessed the BRF Report to understand the skipping issue, prepared an updated SOW and issued an RFI to industry.  *See* FAR 15.201(e) (noting that RFIs may be used to obtain "market information" and information on "capabilities for planning purposes").  ICE then thoroughly evaluated the body armor samples submitted by each of the four vendors, and documented that analysis in its RFI Response Evaluation Abstract, its MRR, and its Award Decision Memorandum.  AR 485-87, 501, 566-67. Point Blank claims that ICE's market research was inadequate and that ICE should have done more, such as by performing its own testing.  Dkt. 48-1 at 29.  But as discussed above, the extent of the market research must be considered in light of the circumstances of the acquisition.  ICE had recently learned about the skipping hazard from a highly-respected FBI testing facility, and ICE also had an urgent need to replenish its body armor inventory before its supplies were depleted.  *See* ███ Decl., Dkt. 33-2 at ¶ 13; Ross Decl., Dkt. 33-3 at ¶ 18.  The record also reveals that a portion of ICE's funds designated to purchase body armor were due to expire in May 2023.  AR 541, 590.  In light of these circumstances, it was eminently reasonable for ICE to rely on the BRF Report and a visual

review of the submitted samples, especially since the award in question is a limited one-year BPA designed to prevent the immediate depletion of ICE's inventory and to give ICE time to plan a competitive acquisition.  *See* AR 523 ("ICE will issue a competitive acquisition . . . to acquire body armor during the BPA ordering period.").

Point Blank continues to focus on the phrase "FBI benchmark standards" as used in the J&A, alleging that ICE evaluated the vendors' solutions using an unstated requirement.  Dkt. 48-1 at 27-28.   As discussed previously, the "FBI benchmark standards" was merely ICE's shorthand for the enhanced ballistic features derived from the BRF Report and discussed in detail in the RFI.  *See* AR 497, 566.  The RFI's SOW clearly explained these standards:

> The Soft Body Armor Kits that DHS ICE is seeking require ***the following enhanced ballistic resistance standards***.  The Soft Body Armor Kits . . . shall have the following enhanced ballistic resistance features.  Soft Body Armor Kits shall include an internal removable vein behind the soft armor panel to help reduce a push of the soft armor into the area between the breasts.  Soft Body Armor Kits shall include a ballistic resistant fold sewn into an elastic pouch that encapsulates the front armor panel in such a way that front armor panel will have ballistic fold protection when removed from Overt Tactical Carrier (OTC) and worn in the concealed carrier.

AR 8 (emphasis added).  Point Blank clearly was aware of these requirements, as they were the basis of the OCI allegations Point Blank included in the cover letter to its Capabilities Statement. AR 191-92.  In fact, as discussed above, it is evident from the discussion in Point Blank's cover letter that Point Blank actually had obtained a copy of the BRF Report itself prior to submitting its Capabilities Statement.

Point Blank also reiterates its complaint regarding ICE's purchase of ancillary plate carriers from ADS, given that the requirement for plate carriers was removed from the RFI.  Dkt. 48-1 at 35.  As discussed previously, ICE was not required to request information from vendors

regarding every item it could potentially purchase, given the market research purpose of the RFI. *See* FAR 10.001(b) ("When conducting market research, agencies should not request potential sources to submit more than the minimum information necessary."). Moreover, Point Blank ignores the fact that ICE had just recently conducted a competitive procurement for body armor in which it had received samples of the offerors' plate carriers. *See* RFP No. 70CMSW22R00000021, AR 695-96 (requiring submission of 10 Soft Body Armor Kits, which were required to include "One (1) Stand-alone Ancillary Scalable Assaulters Plate Carrier"). At any rate, since Point Blank did not satisfy ICE's enhanced ballistic requirements, it could not have been prejudiced by the fact that the plate carriers were not included in the RFI. *OTI America,* 73 Fed. Cl. at 770-71.[16]

### E.     Point Blank is Not Entitled to Permanent Injunctive Relief

As discussed above, Point Blank cannot succeed on the merits of its protest allegations, and therefore Point Blank is not entitled to a permanent injunction. *BAE Sys. Norfolk Ship Repair, Inc. v. United States*, 163 Fed. Cl. 217, 240 (2022) ("because Plaintiff has not succeeded on the merits, the Court need not balance the three other factors, and Plaintiff is not entitled to injunctive relief."). Regardless, the remaining factors do not favor injunctive relief.

### 1.     Point Blank Has Not Established Irreparable Harm

Point Blank has utterly failed to demonstrate irreparable harm. As it did in its motion for a preliminary injunction, Point Blank relies entirely on generic caselaw and fails to provide any declarations or evidence to show *actual harm*. *See Chromalloy San Diego Corp. v. United*

---

[16] Point Blank also alleges that "there is no indication that the Agency meaningfully considered any products other than those manufactured by TYR" (Dkt. 48-1 at 35-36), but this allegation is based only on ICE's reliance on FBI's testing (discussed above) and the alleged errors in ICE's technical evaluation (discussed in Section IV(C) above).

*States*, 145 Fed. Cl. 708, 744 (2019) ("Protestors may not rely on attorney argument to establish irreparable injury.").  Without a factual showing of harm, Point Blank is not entitled to injunctive relief.

In determining whether a claim presents irreparable harm, the Court looks to whether the plaintiff has an adequate remedy in the absence of an injunction.  *Comprehensive Health Servs., LLC v. United States*, 151 Fed. Cl. 200, 207 (2020) (holding that injunctive relief was not warranted because the protester would not lose the ability to compete for a later contract).  "Any injury alleged must be 'both certain and great,' and the movant must convey that the hardship will have an 'immediate and substantial impact.'"  *Newimar, S.A. v. United States*, 163 Fed. Cl. 240, 253 (2022) (quoting *ACI Techs., Inc. v. United States*, 162 Fed. Cl. 39, 48 (2022)).  Courts have declined to find irreparable harm when a plaintiff claims unspecified economic hardship.  *Obsidian Sols. Grp., LLC v. United States*, No. 20-1602C, 2021 WL 1688892, at *4 (Fed. Cl. Apr. 27, 2021) ("Economic harm to the moving party, standing alone, will not satisfy that burden"), *aff'd*, 54 F.4th 1371 (Fed Cir. 2022); *see also Sierra Mil. Health Servs., Inc. v. United States*, 58 Fed. Cl. 573, 582 (2003) ("economic loss does not, in and of itself, constitute irreparable harm. Only economic loss that threatens the survival of a movant's business constitutes irreparable harm.") (quoting *Found. Health Fed. Servs. v. United States*, No. 93-1717, 1993 WL 738426, at *3 (D.D.C. Sept. 23, 1993)).  Arguments of economic loss have been undercut by evidence that the movant has been awarded other government contracts.  *See Newimar*, 163 Fed. Cl. at 255 (holding no irreparable harm when plaintiff claimed significant economic loss despite evidence that the Department of Defense had recently awarded the plaintiff a five-year, $5 million contract).

First, Point Blank asserts that it has been deprived of the opportunity to fairly compete for a contract, and has therefore lost the profits expected from that contract.  Dkt. 48-1 at 37-38.  But as discussed previously, ICE did not commit to awarding <u>any</u> contract based on the information received in response to the RFI.  AR 2 ("This Sources Sought Notice is not a Request for Quote (RFQ), Request for Proposal (RFP), or Invitation for Bid (IFB), nor does it restrict the Government to any acquisition approach. . . . No award will be made from this Sources Sought Notice.").  Thus, Point Blank cannot establish that it would have been awarded a contract in the absence of the alleged procurement flaws.

Furthermore, any purported lost profits would not have a significant impact on Point Blank's business, as is required in order to demonstrate irreparable harm.  The awarded contract was a one-year, $15 million BPA.  By comparison, Point Blank has received over $61 million from federal awards in FY 2023.   Point Blank Enterprises, Inc., USASpending.gov, https://www.usaspending.gov/recipient/bb1d39b8-bc8e-f58b-2368-856b3a229506-C/latest   (last visited August 7, 2023).  ICE's award to ADS will not cause any substantial economic hardship to Point Blank.

Second, Point Blank fails to explain how ICE's actions have damaged its ability to serve its customers.[17]  Instead, Point Blank simply re-hashes its complaints regarding the FBI's prior actions and ICE's procurement and randomly shares its views on best practices for the development of test protocols.  Dkt. 48-1 at 38.  As mentioned above, information in the public record confirms that Point Blank continues to perform existing contracts and secure new

---

[17] In fact, when Point Blank irrationally argues that the "Agency's improper actions are the sole inhibitor of Point Blank's ability to serve its customers" (Dkt. 48-1 at 39), it is clear from the preceding sentences that the "Agency" that Point Blank is discussing is actually the FBI, not ICE.

contracts.  Point Blank cites *Amazon Web Services, Inc. v. United States*, 147 Fed. Cl. 146, 155-56 (2020), but unlike the protester in that case, Point Blank has provided no evidence that ICE's actions are causing it to lose pre-existing business.

Finally, Point Blank makes no effort to explain how ADS' continued performance of the awarded BPA will irreparably harm Point Blank's ability to compete in a future procurement. Dkt. 48-1 at 39.  Unlike the protesters in the cases it cites, Point Blank provides no evidence that its competitive position will be eroded in any way.  *See* Dkt. 34 at 27-28 (discussing cases).  If anything, Point Blank's motion and the one declaration that it does provide prove just the opposite – that Point Blank's ability to compete in future procurements has not been compromised at all.  Point Blank sings the praises of the recent United States Capitol Police solicitation for body armor, and asserts that it was able to obtain testing results showing its product satisfies the USCP's requirements.  *See* Dkt. 48-1 at 29; Declaration of Michael Foreman, Dkt. 48-5.  Therefore, Point Blank itself has demonstrated that it is fully able to compete in new procurements.

As discussed previously, ICE's J&A states that "ICE will issue a competitive acquisition in the future to acquire body armor during the BPA ordering period" (AR 523), so Point Blank will soon have the opportunity to sell its body armor to ICE.  The BPA award to ADS has no impact on Point Blank's ability to participate in this upcoming procurement.  In fact, the MRR states that "[d]uring the POP of the BPA, the industry will be afforded an opportunity to conduct further testing to meet OFTP's needs in offering body armor that addresses the skipping hazard of potential projectiles for female agents."  AR 504.  As such, Point Blank will have not only the opportunity to compete, but also the opportunity to engage in the testing that it believes was

missing in this procurement.   For all of these reasons, Point Blank has failed to establish irreparable harm.

### 2.      The Balancing of the Hardships Weighs Against an Injunction

Since Point Blank cannot establish irreparable harm, a permanent injunction is not warranted.   *Mitchco Int'l., Inc. v. United States*, 151 Fed. Cl. 537, 550 (2020) ("Plaintiff has shown neither success on the merits nor that it will suffer an irreparable injury absent the sought injunction. We thus need not consider the other factors. No relief is warranted.").   Regardless, the balance of the hardships clearly falls in the Government's favor.   Here again, Point Blank does not even engage with the issue; instead, it merely reiterates its complaints regarding ICE's reliance on the BRF Report and the FBI's testing.   Dkt. 48-1 at 40-41.

The Government has clearly set forth the harm that an injunction would cause.   First, the existing body armor being used by ICE agents does not address the skipping hazard, so an injunction would delay ICE's ability to protect its agents against this threat.   Ross Decl., Dkt. 33-3 at ¶ 18.   Moreover, ICE's inventory of body armor will be depleted by the end of September 2023.   ███████ Decl., Dkt. 33-2 at ¶ 13; Ross Decl., Dkt. 33-3 at ¶ 18.   Aside from the awarded BPA to ADS, there is no other viable contracting vehicle available to ICE to order the body armor it needs.   Ross Decl., Dkt. 33-3 at ¶ 18.   Therefore, if the Court issues an injunction, ICE will not be able to provide proper body armor to its agents, thereby requiring ICE to have to restrict its operations, which would impair ICE's ability to perform its law enforcement mission.   ███████ Decl., Dkt. 33-2 at ¶¶ 13-14, 16-17.

Moreover, the delay caused by an injunction would ████████████████████ ████████. Mr. ██████ notes that an injunction will ████████████████████ ████████████████████████████████████████ ████████████████████████████████████

██████████." *Id.* at ¶ 15.  Mr. Ross further explains that "the body armor ICE needs ███████

████████████████████████████████████████████████████████████████████████████████

██████████████████████████. Ross Decl., Dkt. 33-3 at ¶ 21.  He notes that if ICE "directs

ADS and TYR to stop work, it will result in ████████████████████████████████████

████████████████████████████████████████████████████████████ *Id.* at ¶

22.  Mr. Beck confirmed this information in his declaration. *See* Beck Decl., Dkt. 34-1 at ¶ 14.

As discussed in ADS' prior brief, the Court "is statutorily required to give deference to the interests of national security and national defense." *Def. Tech., Inc. v. United States*, 99 Fed. Cl. 103, 131 (2011) (citing 28 U.S.C. § 1491(b)(3)). *See also Linc Gov't Servs., LLC v. United States,* 96 Fed. Cl. 672, 704-05 (2010) (holding that "the public interest in national defense and national security weighs heavily against the grant of a permanent injunction"), *abrogated on other grounds by Safeguard Base Operations, LLC v. United States*, 989 F.3d 1326 (Fed. Cir. 2021).  This is not a close question – the risks to officer safety and the negative impact of an injunction on ICE's mission far outweigh any potential harm to Point Blank emanating from the award of a one-year, $15 million BPA.

### 3.      The Public Interest Weighs Against an Injunction

Finally, the public interest also weighs heavily against granting Point Blank's request for a permanent injunction.  As discussed above, an injunction would significantly impact ICE's ability to perform its mission, which is to "[p]rotect America through criminal investigations and enforcing immigration laws to preserve national security and public safety." *See* U.S. Immigration and Customs Enforcement (ICE), www.ice.gov/mission (last visited August 6, 2023).

████████████████████████████████████████████████████████████████████
████████████████████████████████████████████

This Court has held that there is significant public interest in the protection of the people of the United States.  *See Global Dynamics, LLC v. United States*, 138 Fed. Cl. 207, 211 (2018) ("The court also recognizes the "paramount import" of the public interest in protecting services related to national defense and national security"); *Intelligent Waves, LLC. v. United States*, 135 Fed. Cl. 299, 315-16 (2017) (denying injunction and finding that the public interest weighed in the defendant's favor when the safety of people was at risk); *Torres Adv. Enter. Sols., LLC. v. United States*, 133 Fed. Cl. 496, 534-35 (2017) ("there is a significant public interest in ensuring the safety of United States citizens … the public interest weighs in defendant's favor.").

Of course, the integrity of the procurement process is also important to the public interest. But as discussed here and in the Government's and ADS' prior briefs, Point Blank's allegations do not have merit.  Regardless, any potential imperfections in ICE's procurement are insignificant compared to the paramount importance of ensuring the safety of ICE agents and ICE's ability to perform its mission.

V.     **CONCLUSION**

ADS respectfully requests that this Court grant ADS' Cross-Motion for Judgment on the Administrative Record and deny Point Blank's Motion for Judgment on the Administrative Record.

Dated August 7, 2023      Respectfully submitted,

            s/Jamie F. Tabb
            Jamie F. Tabb
            Vinson & Elkins L.L.P.
            2200 Pennsylvania Avenue, NW
            Suite 500 West
            Washington, D.C. 20037
            (202) 639-6773
            jtabb@velaw.com
            *Attorney of Record*

            *Of Counsel*:
            Elizabeth Krabill McIntyre
            Leslie Edelstein

            *Attorneys for Atlantic Diving Supply, Inc.*