Redacted Version

## IN THE UNITED STATES COURT OF FEDERAL CLAIMS
### Bid Protest

| | | |
|---|---|---|
| **POINT BLANK ENTERPRISES, INC.** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Case No. 1:23-cv-00913-DAT** |
| | ) | |
| **v.** | ) | **Judge Tapp** |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | ███████ |
| | ) | |
| **Defendant, and** | ) | |
| | ) | |
| **ATLANTIC DIVING SUPPLY, INC.** | ) | |
| | ) | |
| **Intervenor- Defendant.** | ) | |

## PLAINTIFF POINT BLANK ENTERPRISES, INC.'S
## REPLY TO DEFENDANTS' CROSS-MOTION FOR JUDGEMENT
## <u>ON THE ADMINISTRATIVE RECORD</u>

Dated: August 21, 2023

/s/ Ryan E. Roberts
Ryan E. Roberts
SHEPPARD MULLIN RICHTER & HAMPTON LLP
2099 Pennsylvania Avenue, NW
Suite 100
Washington, DC 20006
(202) 747-2187
reroberts@sheppardmullin.com
*Attorney of Record*

*Of counsel:*
Anne B. Perry
Nikole R. Snyder
Lillia J. Damalouji
SHEPPARD MULLIN RICHTER & HAMPTON LLP

*Attorneys for Point Blank Enterprises, Inc.*

# TABLE OF CONTENTS

I.      INTRODUCTION .......................................................................................................... 1

II.     ARGUMENT ................................................................................................................. 2

   A.  The Record Establishes The Existence Of TYR's OCIs And None Of The Exceptions
       To The OCI Rules Apply .......................................................................................... 2

     1.  The Furnishing Complete Specifications Exception Does Not Apply Because TYR
         Was Not Providing ████████████████ When The FBI Requested TYR
         Furnish The Specifications ........................................................................... 3

     2.  The Development And Design Exception Does Not Apply Because TYR Was Not
         Performing Under A Development Contract ................................................. 4

     3.  The Sole Source Exception Does Not Apply Because TYR Was Not The Sole
         Source Of The ████████████ At The Time The OCI Was Created ................ 5

     4.  The FAR Does Not Require That A Contractor Be "Tasked" With Preparing
         Specifications To Create An OCI ................................................................. 6

     5.  Knowledge Of An Eventual Competitive Acquisition Is Not Required For An OCI
         To Exist ....................................................................................................... 7

     6.  The Information The FBI Provided To TYR Gave TYR An Unfair Competitive
         Advantage .................................................................................................... 8

   B.  The Record Establishes The Existence Of TYR's OCIs And The Agency's Decision
       To Ignore The OCIs Was Irrational And Contrary To Law ...................................... 9

   C.  Point Blank Repeatedly Has Demonstrated Prejudice .................................................. 10

   D.  Remand Is Inappropriate Where, As Here, The Contracting Officer Already
       (Irrationally) Decided To Ignore The OCIs .............................................................. 14

   E.  The Agency Has Imposed Requirements That Are Not Rationally Related To The
       Agency's Needs And Are Unduly Restrictive Of Competition ................................. 15

     1.  The Requirement To Use ████████████ ██████████████████ To Defeat The
         Skipping Hazard Is Unduly Restrictive Of Competition ........................... 15

     2.  The Agency's Post-Litigation Justifications All Relate To A Covert Configuration,
         Which Was Never Tested ............................................................................ 16

      3.    **The Agency's Mandatory Requirements For Non-Essential Features, Including Buckle Size And A Prohibition On Laser Cut Webbing, Also Are Unduly Restrictive Of Competition** ............................................................ **17**

  F.   **The Agency's Sole Source Award Decision Was Irrational Because It Was Based On A Flawed Technical Evaluation And Inadequate Market Research** ........................ **18**

    1.   **The Agency Treated Offerors Disparately By Waiving Mandatory Requirements For Only One Offeror (ADS).** .................................................................. **18**

    2.   **The AR Confirms The Agency's Technical Evaluation Is Patently Incorrect** ....... **20**

  G.  **Point Blank Is Entitled To Injunctive Relief** .................................................. **23**

    1.   **The Harm To Point Blank Is Not Solely Economic** ..................................... **23**

    2.   **The Balance Of The Hardships And The Public Interest Weigh In Favor Of An Injunction** ............................................................................................. **25**

III.     **CONCLUSION** .................................................................................................. **26**

# **TABLE OF AUTHORITIES**

Page(s)

<u>Cases</u>

*Allicent Tech, LLC v. United States*
   *166 Fed.Cl. 77* (2023) ............................................................................................................20

*ARINC Eng'g Servs., LLC v. United States*
   77 Fed.Cl. 196 (2007) ..............................................................................................................9

*BayFirst Solutions, LLC v. United States*
   102 Fed.Cl. 677 (2012) ...........................................................................................................22

*Ceres Envtl. Servs. v. United States*
   52 Fed. Cl. 23 (2002) ..............................................................................................................18

*Connected Global Solutions, LLC v. United States*
   160 Fed. Cl. 420 (2022) ............................................................................................................9

*CW Gov't Travel, Inc. v. United States*
   154 Fed. Cl. 721 (2021) ..........................................................................................................25

*Green Tech. Grp., LLC v. United States*
   147 Fed. Cl. 231 (2020) ..........................................................................................................25

*Hosp. Klean of Tex., Inc. v. United States*
   65 Fed. Cl. 618 (2005) ............................................................................................................24

*Hunt Bldg. Co. v. United States*
   61 Fed. Cl. 243 (2004) ......................................................................................................20, 22

*Informatics Corp. v. United States*
   40 Fed. Cl. 508 (1988) ............................................................................................................10

*Jacobs Tech., Inc. v. United States*
   100 Fed. Cl. 198 (2011) ..........................................................................................................14

*L-3 Commc'ns. EOtech, Inc. v. United States*
   83 Fed. Cl. 643 (2008) ......................................................................................................19, 20

*MORI Assocs., Inc. v. United. States*
   102 Fed. Cl. 503 (2011) ..........................................................................................................23

*NetStar-1 Gov't Consulting, Inc. v. United States*
   101 Fed. Cl. 511 (2011), *aff'd per curium*, 473 Fed.Appx. 902 (Fed.Cir.2012)
   (unpublished) ..........................................................................................................9, 10, 14

*PGBA, LLC v. United States*
   60 Fed. Cl. 196 (2004), *aff'd*, 389 F.3d 1219 (Fed. Cir. 2004)................................19

*Remington Arms Co., LLC v. United States*
   126 Fed. Cl. 218 (2016) ............................................................................................23

*Turner Constr. Co. v. United States*
   645 F.3d 1377 (Fed. Cir. 2011)..................................................................................7

*Vantage Associates, Inc. v. U.S.*
   59 Fed.Cl. 1 (2003) ....................................................................................................4

Other Authorities

48 C.F.R. § 2.101 .................................................................................................................8

48 C.F.R. § 9.504(d) ...........................................................................................................2

48 C.F.R. § 9.505 ........................................................................................................3, 4, 8

48 C.F.R. § 9.505-2(a)(1)....................................................................................................7

48 C.F.R. § 9.505-2(a)(1)(i)................................................................................................3

48 C.F.R. § 9.505-2(a)(2)....................................................................................................3

48 C.F.R. § 9.505-2(a)(3)....................................................................................................4

48 C.F.R. § 9.505-2(b)(3) ...................................................................................................4

FAR 2.101.............................................................................................................................8

FAR 9.505-2 .........................................................................................................................2

FAR 9.505-4 .........................................................................................................................2

FAR 9.508(c) ........................................................................................................................5

## I.        INTRODUCTION

The record before the Agency demonstrates, at a very minimum, the existence of

ADS's/TYR's unmitigated Organizational Conflicts of Interest ("OCIs"). Indeed, the only

document the Agency used to craft its requirement for the instant acquisition was the FBI

Report[1] that shows one body armor manufacturer, TYR: (1) received exclusive access to

confidential Government information about a skipping hazard that existed in all armor, and (2)

developed its product solution with direct input from the Government. The FBI Report even

reflected the FBI's specific endorsement of TYR's product and suggested recipients of the FBI

Report contact TYR to learn more about the Government's requirements. In addition, the AR

shows at least two potential offerors notified ICE that TYR had an unmitigated OCI.

In the face of these facts, the AR contains no documents suggesting the Contracting

Officer took any action to ascertain whether an OCI existed or took any steps to mitigate the

OCI, as required under the FAR. Instead, the AR shows that ICE justified its sole source award

based exclusively on the results of conduct inextricably linked to the OCI. Moreover, the AR

demonstrates the Agency treated offerors disparately by waiving requirements (including a

requirement ██████) as to ADS's/TYR's product only, and that the Agency conducted only

a visual observation of the offered products. The AR also shows the Agency's evaluation is

patently incorrect in multiple respects. Although the Government asks this Court to ignore all of

this misconduct because it alleges the safety of law enforcement officers is at stake, the facts

---

[1] As in Point Blank's MJAR (ECF 48-1), the FBI Report referenced herein refers to the FBI's
August 23, 2022 report titled "Female Body Armor Risk Identification & Mitigation."

show there are alternatives that can be procured quickly and that are, at worst, equally protective for law enforcement officers.

## II.      ARGUMENT

### A.      The Record Establishes The Existence Of TYR's OCIs And None Of The Exceptions To The OCI Rules Apply

The AR demonstrates that the award to ADS/TYR is tainted with two types of OCIs – (1) a biased ground rules OCI under FAR 9.505-2, caused by the Government's use of the specifications created by TYR, and (2) an unequal access to information OCI under FAR 9.505-4, caused by the Government's provision of nonpublic information about its requirements to TYR. *See* ECF 48-1 at 18. The AR further reflects the Contracting Officer did not undertake any effort to determine whether there was a "substantive issue concerning potential organizational conflict of interest." *Ibid*; 48 C.F.R. § 9.504(d). Further, the AR confirms none of the exceptions to the OCI rules apply. To the contrary, the AR demonstrates the Agency possessed information that any reasonable person would consider to create at least an appearance of an OCI. *See* AR 191-192, AR 655-656, AR 783-785. Yet, the AR includes no evidence the Agency analyzed (much less attempted to mitigate) the OCIs, and the Agency instead issued a sole source contract based on the fruits of the OCI. And, in doing so, the Agency did not determine that any OCI exceptions applied.

Moreover, in arguing that exceptions to the OCIs exist, Defendants' are forced to apply interpretations of the OCI rules and exceptions that render the rules meaningless and directly contradict the OCI rules' central purposes – to ensure no single offeror is able to bias procurement requirements in its favor or gain an unfair competitive advantage through receipt of

inside knowledge of the Government's requirements. 48 C.F.R. § 9.505 ("The two underlying

principles are (a) preventing the existence of conflicting roles that might bias a contractor's

judgment; and (b) preventing unfair competitive advantage.").

    **1.**  **The Furnishing Complete Specifications Exception Does Not Apply Because TYR Was Not Providing ███████████ When The FBI Requested TYR Furnish The Specifications**

Defendants argue that, even though TYR provided complete specifications for its

████████████, TYR does not have an OCI because the FAR allows a contractor to furnish

complete specifications to the government "for a product they provide." 48 C.F.R. § 9.505-

2(a)(1)(i). Defendants essentially argue that because the FBI subsequently purchased the

products TYR developed with its unequal access to information, the OCI prohibition does not

apply. *See* ECF 50 at 15-16; ECF 52-1 at 18. Such a tortured interpretation would render the

prohibition meaningless and Defendants cite no caselaw to support it. Here, the specifications

TYR provided (specifically, the "███████████") were prepared at the Government's out-

of-scope request for a change to a nondevelopmental item (and with the Government's input as

to what this change should include), and any subsequent purchase thus fall squarely within the

prohibition and outside of the exception.[2] 48 C.F.R. §9.505-2(a)(2).

---

[2] ADS attempts to minimize the FBI's disclosure of non-public information about the skipping hazard and its requirement for a solution by claiming the contract allowed for twice annual performance meetings. ECF 52-1 at 10. This superficial explanation ignores that TYR's meeting with the FBI occurred just *three weeks* after contract award, and further demonstrates that the FBI requirement for a solution to the purported skipping hazard should have been competed from the outset of the contract.

2.     **The Development And Design Exception Does Not Apply Because TYR Was Not Performing Under A Development Contract**

Defendants also argue the development and design exception to the OCI rules applies. *See* ECF 52-1 at 18; 48 C.F.R. § 9.505-2(a)(3). This argument ignores a critical point - ADS/TYR was not performing under a development contract. See ECF 48-1 at 22. ADS argues, nonetheless, the purpose of the exception still should apply. That is, "that firms that participate in development work 'can frequently start production earlier and more knowledgeably than firms that did not participate in the development, and this can affect the time and quality of production, both of which are important to the Government.'" ECF 52-1 at 19 (citing 48 C.F.R. § 9.505-2(a)(3)). This still ignores that the participation in development work must be under a contract with the Government for such development and for *other than nondevelopmental items*. *See* 48 C.F.R. § 9.505-2(b)(3) ("no prohibitions are imposed on development and design contractors."); *see also, Vantage Associates, Inc. v. U.S.*, 59 Fed.Cl. 1, 11-12 (2003) (explaining the development and design exception applied because awardee was a "***development and design contractor***" that "continues to have ***overall contractual responsibility***" for the system development) (emphasis added). ADS fails to cite a single case showing the exception for a development and design contractor can apply to an entity that did not have a development contract with the Government and where the product at issue was a nondevelopmental or commercial item. Moreover, ADS's interpretation again circumvents the entire purpose of the OCI rules (*i.e.*, to avoid providing one offeror an unfair competitive advantage). *See* 48 C.F.R. § 9.505.

-4-

Here, the FBI provided non-public information to TYR outside the scope of ADS's supply contract for a commercial item. The Government did not issue a contract for the development of a solution. Certainly, if the Government had competitively awarded a development contract, and paid to develop a product or product enhancement, the Government should obtain the benefit of its prior investment. That is the purpose of the design and development exception.

ADS's reliance on the example from FAR 9.508(c) is inapposite. This example highlights a set of facts where a contractor has no competitive advantage because it developed a new product on its own accord. The exact opposite facts are present here – ADS/TYR was afforded an unfair competitive advantage through receipt of inside knowledge of the Government's requirements, subsequently worked hand-in-hand with the FBI to create a new product with features the FBI directed be included, and then used that competitive advantage to obtain Federal contracts. This is precisely the type of behavior the OCI rules were drafted to prohibit.

> **3.    The Sole Source Exception Does Not Apply Because TYR Was Not The Sole Source Of The ███████████ At The Time The OCI Was Created**

Defendant also argues TYR was allowed to prepare or assist in preparing the underlying information for the statement of work for the ███████████ because TYR is the only source of the ███████████. This ignores that at the time the OCI was created (*i.e.*, when the FBI gave TYR non-public information and assistance so TYR could create a new or enhanced product) TYR was *not* the sole source of a solution to the skipping hazard. The FBI Report makes clear that, prior to the FBI informing ADS/TYR of its concern with the skipping hazard, no companies were offering a solution. AR 782 (stating the FBI was "unaware of any armor

design which currently addresses the risk factor."). Then, because of the non-public information and assistance the FBI provided only to TYR and withheld for two years from all others, including other law enforcement entities, TYR was able to become the sole source provider of the "███████████," one potential solution to the skipping hazard. AR 783-785. Attempting to rely on the sole source exception to the OCI rules when a company only is the sole source *because of the OCI* undermines the entire purpose of the OCI regulations and renders the rules meaningless.

> **4.      The FAR Does Not Require That A Contractor Be "Tasked" With Preparing Specifications To Create An OCI**

ADS argues that for a contractor that prepared specifications used in a future solicitation to have an OCI, the contractor must be "tasked" by the government with preparing the specifications. ECF 52-1 at 15. First, the "tasking" language is not in the FAR. Second, this interpretation undermines the OCI rules. Third, TYR was tasked by the FBI to develop a solution (though, outside the scope of any contract). Under ADS's reading, the company would not have an OCI simply because the Government did not task the contractor with writing down the specifications. Here, not only is that an absurd interpretation, but also, the FBI *did task* TYR with preparing the solution (*i.e.*, the specifications for the enhanced product). ECF 33-1, ███████ Decl. ¶ 10-11 ("I approached Tyr Tactical on or about September 3, 2020, and inquired about their ability to find a solution [. . .] that would be integrated into the soft armor kit, rather than a separate neck attachment."). ICE then relied exclusively on those specifications to develop its requirement. ECF 50 at 22 n.6 (noting Point Blank "correctly stat[ed], 'that ICE developed the SOW based exclusively on the FBI Report. . . . '").

Thus, by working hand-in-hand with the FBI to create a product that would defeat the skipping hazard (TYR's ▮▮▮▮▮▮▮▮▮▮▮▮), TYR participated in the process of setting the ground rules for ICE's future requirement for a ballistic resistant fold to defeat the skipping hazard. This is the exact situation the OCI rules seek to avoid. *See Turner Constr. Co. v. United States*, 645 F.3d 1377, 1382 (Fed. Cir. 2011) ("[t]he biased ground rules category of OCIs focuses on the concerns that a company may, by participating in the process of setting procurement ground rules, have special knowledge of the agency's future requirements that may skew the competition in its favor.").

### 5. Knowledge Of An Eventual Competitive Acquisition Is Not Required For An OCI To Exist

ADS also argues prior knowledge of a future procurement is required to create an OCI. Here again, the FAR does not state that prior knowledge is required. The FAR only requires that those specifications be *used* in a competitive acquisition. 48 C.F.R. § 9.505-2(a)(1) ("If a contractor prepares and furnishes complete specifications covering nondevelopmental items, ***to be used in a competitive acquisition***, that contractor shall not be allowed to furnish these items . . .") (emphasis added). That is what happened here. Moreover, if TYR did not believe the enhancement/specifications for the enhancement would be used in future competitive procurements for commercial or nondevelopmental items, then TYR would not have filed to patent the enhancement prior to the information becoming widely available via the FBI Report. *See* ECF 34-1, Beck Decl. ¶ 7 ("TYR has a patent pending on the ▮▮▮▮▮▮▮▮▮▮▮.").

### 6. The Information The FBI Provided To TYR Gave TYR An Unfair Competitive Advantage

Finally, Defendants argue TYR did not have an unequal access OCI because the non-public information it received from the FBI does not fit squarely within one of the enumerated categories of source selection information (SSI) defined in FAR 2.101. *See* ECF 50 at 27; 48 C.F.R. § 2.101. This ignores that where the Government provides inside information regarding the Government's requirements to only one potential offeror, such information inherently is SSI. In particular, here, the information and assistance TYR received from the FBI was, at a minimum, a technical evaluation and certification of TYR's proposed enhancement.

Once again, this argument ignores the purpose of the FAR's OCI rules, which are to prevent one offeror from obtaining an unfair competitive advantage. 48 C.F.R. § 9.505. Additionally, the FAR's overarching definition of an OCI focuses on "activities or relationships" that create "an unfair competitive advantage." 48 C.F.R. § 2.101 ("*Organizational conflict of interest* means that because of other activities or relationships with other persons [. . .] a person has an unfair competitive advantage."). The information the FBI provided to TYR about acceptable solutions to the skipping hazard disclosed only to TYR, and the feedback the FBI provided during the "numerous iterations," undeniably gave TYR an unfair competitive advantage in any future competitions seeking the ███████████████ as the solution to the skipping hazard.

In short, even if the Court were to look beyond the AR, which contains no analysis of the OCIs, the "hard facts" here support two types of OCIs—biased ground rules and unequal access to information—and none of the exceptions offered by the Defendants apply.

**B.** **The Record Establishes The Existence Of TYR's OCIs And The Agency's Decision To Ignore The OCIs Was Irrational And Contrary To Law**

The Court's review of the Agency's actions is limited to the AR. *See Connected Global Solutions, LLC v. United States*, 160 Fed. Cl. 420, 424 (2022). Here, the AR demonstrates that prior to (and after) the Agency released the RFI, it was aware that TYR had *at least the appearance* of a significant OCI. As this Court has explained, "[a] significant potential conflict is one which provides the bidding party a substantial and unfair competitive advantage during the procurement process on ***information or data not necessarily available to other bidders***." *NetStar-1 Gov't Consulting, Inc. v. United States*, 101 Fed. Cl. 511, 529 (2011), *aff'd per curium*, 473 Fed.Appx. 902 (Fed.Cir.2012) (unpublished) (citing *PAI Corp. v. United States*, 614 F.3d 1347, 1352 (Fed. Cir. 2010) (emphasis added); *see also ARINC Eng'g Servs., LLC v. United States,* 77 Fed.Cl. 196, 202-203 (2007). But, the Contracting Officer did nothing to analyze or mitigate the OCI. Specifically, the AR contains the FBI Report, which (1) shows the FBI and TYR worked together to develop and test a solution to the skipping hazard (*i.e.*, TYR's ███ ███████) (AR 783-785); (2) endorses TYR's product as the only solution to the skipping hazard (AR 785); and (3) directs questions about the FBI Report to TYR, reasonably suggesting that TYR worked with the FBI on the content of the report and could uniquely address questions about the Government's requirements (*Id.*).

The AR also contains RFI responses from two separate offerors (Point Blank and Aspetto) that raised concerns about TYR's potential OCI. AR 191-192, AR 655-656. The RFI responses provided specific notice to the Contracting Officer of the OCI concerns, suggested ways the Agency could mitigate the OCIs, and raised the possibility of a protest if the

Contracting Officer chose not to mitigate the OCIs. AR 191-192, AR 655-656. Thus, even if the Agency somehow mistakenly overlooked the potential OCIs when it initially reviewed the FBI Report, it certainly knew of the concerns after they specifically were raised by two offerors. Yet, the AR contains no evidence that the Contracting Officer even considered whether TYR had an OCI. The failure to consider (or, alternatively, to document) how to avoid or mitigate such an OCI was unreasonable. *See e.g., Informatics Corp. v. United States*, 40 Fed. Cl. 508, 515–17 (1988) (finding that the contracting officer acted unreasonably by "fail[ing] to document formally her judgment" regarding the OCI, thereby making it "virtually impossible to ascertain, in retrospect, whether [the contracting officer] considered," how to avoid or mitigate the apparent OCI.").

### C.       Point Blank Repeatedly Has Demonstrated Prejudice

First, "[a] long line of cases holds that when a potential significant OCI is identified, prejudice stemming from that OCI is presumed, unless [there is] compelling evidence to the contrary." *NetStar-1 Gov't Consulting, Inc. supra*, 101 Fed. Cl. at 529 (cleaned up).

In any event, Defendant's contention that Point Blank asks the Court to assume prejudice, rather than establishing it, is untrue. Point Blank detailed its harm at length in its Complaint (ECF 1 at ¶¶ 11, 27, 59-66, 90, 100-105, 113, 122, and 141), Motion for TRO (ECF 27-1 at 7-10, 16-17, 19, and 32-34), and MJAR (ECF 48-1 at 9-11, 15, and 37-39). A central basis of this protest is that TYR received information from the Government that no one else received and, based on that inside information, TYR alone was provided the opportunity to develop and patent a solution to the skipping hazard (*i.e.*, the ███████████████). The FBI withheld the information about the skipping hazard from everyone other than ADS/TYR (including other law

enforcement agencies) for **two years**. *See* ECF 33-1, ███████ Decl. ¶ ("I approached Tyr

Tactical on or about September 3, 2020); *see also* AR 779 (the FBI Report, dated August 23,

2022).  Then, based on the FBI Report, ICE specifically requested ███████████████████

███████████████████) and issued a sole source award to ADS/TYR for a product ████████

████████████. *See* AR 1 ("Soft Armor kits **shall** include an internal removal vein [. . .] and

a **ballistic resistant fold** sewn into an elastic pouch that encapsulates the front panel.") (emphasis

added); AR 521 (justifying the sole source award by stating ADS (supplying TYR's armor) "is

the only source capable of providing the body armor required at the level of quality required

because the body armor required is unique."). Point Blank offers similar products (including

products that solve the skipping hazard), but because it does not offer TYR's solution, it was not

considered for award of the $14.5M BPA. Apart from this, as a direct result of the FBI Report,

Point Blank has received a number of concerned customer inquiries about the efficacy of its

products. ECF 1-2, Halstead Decl. ¶ 4. There is no question Point Blank was (and continues to be

prejudiced) as a result of the Government's actions.

Although the facts surrounding the FBI's offer for a meeting have been detailed in Point

Blank's prior filings, we outline them again here to correct the record because the Defendants so

grossly misrepresent the facts. Defendants would have the Court believe the FBI graciously

reached out to Point Blank in October 2022 and offered a meeting to provide Point Blank with

all of the necessary information about the skipping hazard and the testing information, but Point

Blank declined that offer in order to maintain its information disadvantage in the hopes of

eventually being able to protest on the basis of an OCI. This description is woefully inaccurate.

Here, viewing *all of the facts* is critically important. In reality, Point Blank tried for months (via multiple avenues) to obtain *any* information from the FBI related to the alleged fatal flaw in Point Blank's armor. ECF 1 at ¶¶ 30-66. The FBI stonewalled Point Blank at every turn. *Id*. at ¶¶ 38, 48, 51, 55, 57, 58, and 66. When FBI counsel finally proposed a virtual meeting (after nearly a month and a half of requests for information and for discussions by Point Blank) but refused to provide any documentation, Point Blank reasonably was skeptical about whether such a meeting would be meaningful. By this point, Point Blank still had not received any material information from the Government and instead had been directed by Mr. ███ to contact TYR for more information.[3] *Id*. at ¶ 38; ECF 1-2, Halstead Decl. at ¶ 7. Thus, in order to allow Point Blank to actually engage in a "frank discussion," Point Blank's counsel merely requested the FBI provide some of the materials in advance. ECF 1-1 at 73. The FBI did not respond. *Ibid*. Point Blank's counsel then followed up again, accepting the offer for a discussion, and reiterating its request to review the relevant materials in advance. *Ibid*.  Here again, the FBI did not respond. *Ibid*. The FBI's actions confirmed what Point Blank suspected all along – the FBI had no intention of having a "frank discussion" with Point Blank.

Moreover, Defendant's contention that the FBI would have provided any material information during such a meeting is pure speculation and contradicted by the surrounding facts. The FBI's repeated refusal – to this day – to provide a copy of any materials directly contradicts

---

[3] Defendant's suggestion that the 71 seconds of slow-motion video somehow provided Point Blank with an information advantage is absurd. The two short video clips of a projectile hitting a vest (in slow motion) provide extremely limited information other than highlighting the discrepancies between the two clips with respect to shot placement and fit of the armor applied to the two vendors.

-12-

the Government's bare claims the FBI would have provided the same information during a virtual meeting. In this litigation, the Government has not been shy about providing declarations to support its claims. But, tellingly, the Government provided no such proffer or support regarding what information the FBI supposedly would have provided during a virtual meeting. The Government even refused to provide a copy of the FBI Report under the original protective order in this case, based on alleged sensitivity of the content. It defies logic for the Government now to argue (retrospectively) that it would have disclosed that information orally to Point Blank, or why communicating this information during a meeting would not have compromised the sensitive information contained in the FBI Report. So, it is unclear what information the FBI could have provided that would have corrected Point Blank's significant, **two-year** informational disadvantage.[4]

Relatedly, the Government seems confused about the timing of TYR's "two-year head start." ECF 50 at 30. The math is simple. The FBI disclosed the skipping issue to TYR on September 3, 2020. ECF 33-1, ████ Decl. at ¶ 10. Point Blank learned of the existence of the skipping issue in late-August 2022, following the WIFLE presentation and the FBI's widespread release of the FBI Report to other law enforcement agencies (*i.e.*, Point Blank's customers). ECF 1-2, Halstead Decl. at ¶ 4. Thus, even counting from the absolute earliest—when Point Blank first heard rumors of some skipping issue from customers—the time between September 3, 2020 and late August 2022 accounts for TYR's *minimum* two-year head start. The only perplexing

---

[4] Alternatively, if the Government now contends that not all of the information in the FBI Report is sensitive, the FBI could have provided a redacted version prior to the meeting. Instead, it provided nothing and stopped responding altogether.

aspect of this timeline is why the FBI concealed the existence of this purported threat from

everyone other than ADS/TYR for those two years, including other law enforcement agencies.

### D.    Remand Is Inappropriate Where, As Here, The Contracting Officer Already (Irrationally) Decided To Ignore The OCIs

Under the specific facts of this case, the Government's proposed remand—simply to

permit the Contracting Officer to document its irrational determination that an OCI does not

exist—is inappropriate. Defendants contend that the AR is complete and the Contracting Officer

already considered all of the information surrounding TYR's OCIs and decided that not even a

potential OCI existed warranting further consideration or documentation. Based on the

information contained in the AR, that decision was unreasonable, arbitrary, and capricious. But,

there is nothing new for the Contracting Officer to review now that was not available when the

Contracting Officer allegedly made his initial decision. Thus, on these facts, remanding the issue

to the Agency is not an appropriate remedy. Instead, based on the complete AR here, the Court

should determine an OCI exists, find the Agency's decision otherwise was arbitrary and

capricious, and enjoin performance of the BPA. *See NetStar-1*, 101 Fed. Cl. 511 (Oct. 17, 2011)

(finding a potentially significant unequal access to information OCI existed and enjoining

awardee from performing on the contract).

Even if remand were appropriate here (it is not), remanding to the Agency for further

consideration, without issuing an injunction, is inappropriate. *See Jacobs Tech., Inc. v. United

States*, 100 Fed. Cl. 198 (2011) (finding arbitrary and capricious the agency's decision not to

pursue additional OCI analysis in light of issues raised by the protestor, and enjoining the agency

from awarding the contract until it completed such additional OCI analysis). Here, if the Court

remands the OCI issue to the Agency, without issuing an injunction, the Agency will have no incentive promptly to correct its numerous violations of procurement law and regulation. Instead, the Agency would be allowed to continue to receive a product (obtained through an illegal award), thus increasing the irreparable harm to Point Blank. The Agency should not be rewarded for its failure to follow the procurement rules.

**E.   The Agency Has Imposed Requirements That Are Not Rationally Related To The Agency's Needs And Are Unduly Restrictive Of Competition**

Despite Defendants assertions to the contrary, Point Blank does not argue that mitigating a skipping hazard (after standardized testing confirms it exists) is unrelated to an Agency need. Here, Point Blank simply takes issue with the specific requirements the agency included regarding *which product* must be used and *how* the product must mitigate the skipping hazard. Those specific requirements are not legitimately related to any Agency need and therefore are unduly restrictive of competition.

**1.   The Requirement To Use ██████████ ██████████ To Defeat The Skipping Hazard Is Unduly Restrictive Of Competition**

First, to defeat the skipping hazard, the Agency specifically requires use of ████ ██████████. *See* AR 1 (under "REQUIREMENT" the RFI directs "Soft Armor kits *shall* include an *internal removal vein* [. . .] and a *ballistic resistant fold* [. . .].") (emphasis added). The Agency's explanation clarifies the "FBI benchmark standards for throat protection" referred specifically to ██████. ECF 50 at 37 (stating "the 'FBI benchmark standards for throat protection' appear on the first page of the RFI, listed plainly under 'REQUIREMENT'" and then quoting language from the RFI (AR 1) stating, "The body armor [. . .] *shall* have the following enhanced ballistic features: Soft Armor kits *shall* include an *internal*

-15-

*removal vein* [. . .] and a ***ballistic resistant fold*** [. . .].") (emphasis added). Indeed, the only reasonable way to read this requirement is that the Agency was seeking ███████████ ███████

The Agency's post-litigation explanation that it would have considered other products is directly contradicted by the mandatory requirement in the RFI. Moreover, as explained in detail in Point Blank's prior filings, and uncontested by the Agency, Point Blank's offered overt armor—worn in conjunction with the throat and neck protection—also defeats the skipping hazard. Additionally, as detailed in its previous filing, the Capitol Police have found Point Blank's solution for *covert* armor to defeat the skipping hazard. *See* ECF 48-5, Foreman Decl. ¶ 9. Thus, including a requirement to use ████████████ was unrelated to the Agency's actual need (to defeat the skipping hazard) and was unduly restrictive of competition.

### 2. The Agency's Post-Litigation Justifications All Relate To A Covert Configuration, Which Was Never Tested

The Agency's stated justifications for why the enhanced ballistic protection ███████ ████████████████ needed to be integrated relates only to armor worn in a *concealed* manner, rather than an *overt* configuration. The AR includes no evidence testing was done by the FBI or by ICE on armor worn in a *concealed* configuration, and makes clear ICE relied on FBI's testing of the overt configuration. This is an important distinction because armor worn in a concealed configuration behaves differently. For example, in a concealed configuration the armor fits more snugly against the body, there are fewer/smaller air gaps, and there is no thick material over the armor that can bunch up (which is one of the underlying causes the FBI cites for the skipping hazard). *See* AR 782 ("████████████████████████████

-16-

████████████████████████████████
███████████████

███████████████████████████████████████████████████████

████████ [. . .] ."). Thus, because armor worn in a concealed configuration never was tested or shown to cause the skipping issue, the Agency's requirement to mitigate a skipping hazard in a concealed configuration was unreasonable. Both the Defendant and ADS attempt to distract the Court from this material difference by indicating it would have been unreasonable to assume the risk did not also exist in the concealed configuration. But this misses the point. The Agency did not need to assume anything – it simply could have tested both configurations. But it did not. Relying on unsupported assumptions in lieu of actual test data demonstrates the unreasonable and irresponsible nature of the Agency's actions.

### 3.   The Agency's Mandatory Requirements For Non-Essential Features, Including Buckle Size And A Prohibition On Laser Cut Webbing, Also Are Unduly Restrictive Of Competition

Two of the specific justifications the Agency relied upon for its determination that Point Blank did not offer an acceptable solution relate to non-essential features of the product. First, the Agency noted in the J&A that Point Blank's product did not have a 4 inch buckle system "to allow single handed operation." AR 522. As discussed previously, this is incorrect as Point Blank's carrier can be removed with one hand. Nothing in the AR states Point Blank's carrier cannot be removed with one hand and the Agency now concedes this factor was not the reason Point Blank's product was eliminated from consideration. ECF 50 at 36.

Second, the Agency included an unnecessary restriction on laser cut webbing. After explaining the requirement relates to the aesthetics (rather than the function) of the vest, the Agency now claims ███████████████████████████████████████████

████████████████████ ECF 50 at 36 n.15.  There is no support for this assertion in the AR (or

███████████████████████████████████████████████████████

even in the declaration of ICE OFTP Special Agent ██████████, which discusses the rationale

for other technical requirements) and there is no evidence this explanation is accurate. *See Ceres*

*Envtl. Servs. v. United States*, 52 Fed. Cl. 23, 41 n.9 (2002) (noting that *post hoc* rationalizations

for an agency's determination should not be relied upon).

### F. The Agency's Sole Source Award Decision Was Irrational Because It Was Based On A Flawed Technical Evaluation And Inadequate Market Research

The AR shows the Agency's technical evaluation and corresponding award decision is

rife with significant errors. Such errors, individually and collectively, led to the Agency's

unreasonable decision to bypass competition requirements and instead issue a sole source BPA

to ADS/TYR.

### 1. The Agency Treated Offerors Disparately By Waiving Mandatory Requirements For Only One Offeror (ADS).

The Agency does not dispute that ADS failed to ████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████ AR 9. Even ADS

concedes it failed to meet the requirements because it ████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████

████ *See* ECF 52-1 at 32. The Agency also concedes it waived this requirement for ADS

because ████████████████████ performance of the TYR equipment, which is

undisputed. Therefore, it is unclear how ████████████████████ ECF 50 at 40.

The Agency's explanation makes clear the Agency treated offerors disparately by

waiving mandatory requirements for only one offeror (ADS). This alone should invalidate the

████████████████████████████████████████████████████

████████████████████████████

Agency's procurement decision. *See L-3 Commc'ns. EOtech, Inc. v. United States*, 83 Fed. Cl. 643 (2008) (finding the agency's decision invalid where it waived a requirement that an offeror provide required test data for the benefit of only one offeror); *see also Hunt Bldg. Co. v. United States*, 61 Fed. Cl. 243, 273 (2004) (an "agency's failure to follow the terms of its own Solicitation and selection of an offeror based upon different requirements than those imposed upon the only other offeror[s] are quintessential examples of conduct which lacks a rational basis."); *see also PGBA, LLC v. United States*, 60 Fed. Cl. 196, 207 (2004) (noting that a certain level of "uneven treatment goes against the standard of equality and fair-play that is a necessary underpinning of the federal government's procurement process and amounts to an abuse of the agency's discretion") (citations omitted), *aff'd*, 389 F.3d 1219 (Fed. Cir. 2004).



After admitting the Agency waived ███████████████ for ADS/TYR, Defendant explains ███████████ was not mandatory for ADS because ███████████████ (presumably, as noted in the FBI Report).[5] ECF 50 at 40. This ignores that the FBI Report includes only a high level summary ███████████████████████ ███████████ It also does not demonstrate the FBI followed ███████████, and it does not demonstrate the FBI followed any of the required ███████████████████ ███████████████. Therefore, the FBI Report is not a substitute for ████████ ██ and certainly does not prove TYR's product met the requirements of the RFI. It simply is specific evidence the Agency improperly waived a mandatory requirement for the benefit of only

---

[5] It is unclear what ████████ the Agency is referencing here because it cites only to TYR's website, not to anything in the AR. However, we assume the agency is referencing the FBI Report since no other ███████████ was included in ADS/TYR's RFI response.

one offeror (ADS/TYR). Such a decision is irrational. *See L-3 Commc'ns. Eotech, Inc. v. United States*, *supra*.

> ### 2. The AR Confirms The Agency's Technical Evaluation Is Patently Incorrect

Point Blank does not seek to substitute its evaluation for the Agency's. The extent of the Agency's evaluation is a pass/fail checklist with no underlying support. AR 485-486. Point Blank merely points to evidence in the AR that shows the Agency's evaluation checklist is facially incorrect. Regarding the Agency's evaluation of TYR's product, Point Blank simply demonstrates there is no support in the AR ▮▮▮ requirements by indicating "none" next to each requirement. *See* ECF 48-3. If Point Blank is incorrect, Defendant could point to where in the AR evidence of meeting ▮▮▮ requirements can be found. Defendant did not do so because no such evidence exists. ADS concedes the record before the Court does not include evidence the TYR product met ▮▮▮ specifications, and instead asks the Court to assume the Agency validated each of ▮▮▮ requirements via "visual observation." ECF 52-1 at 31-32. It is well-established, though, that the Court is limited to reviewing the AR, and will sustain a protest where the AR does not include support for an Agency's technical evaluation. *See, e.g., Allicent Tech, LLC v. United States, 166 Fed.Cl. 77, 122* (2023) (finding protestor was not "merely disagree[ing] with the agency's evaluation" where protestor addressed requirements the agency's evaluation indicated were absent, and, as such, finding the agency's assessment was arbitrary and capricious). Moreover, if ADS is correct in arguing the Agency conducted only a visual review, when coupled with ADS/TYR's ▮▮▮, further underscores the Agency's determination

that ADS/TYR met the requirement to defeat the skipping hazard (particularly in a covert configuration) was unreasonable.

The Agency also takes issue with Point Blank's assertion that the Agency improperly withheld credit for *at least* ten features of Point Blank's product. Because the Agency contends page cites did not provide sufficient information for the Agency to comprehend this explanation, the chart below includes the specific quotes from those pages of Point Blank's RFI response:

| Agency Evaluation Criteria | AR Support for Point Blank Meeting Requirement |
|---|---|
| Samples (male and female) of size Large Level IIIA Soft Body Armor Kit with enhanced ballistic resistance features | "███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████." AR 194. |
| Front panel w/ molly front flap, upper and side admin pockets, and interior pocket that fits Ballistic Plate =.75 in thickness | "████████████████████████████████████████████████████████████████████" AR 195. |
| Back panel with removable zip-on back panel | "████████████████████████████████." AR 195. |
| 4 inch Front to Back interlocking Cummerbund connector adapters | "████████████████████████████ AR 196. As explained, Defendant has clarified ICE's actual requirement is that the carrier can be removed with one hand. Point Blank meets ICE's actual requirement. |

| | |
|---|---|
| Spare buckles | " ███████████████████████ ███████ AR 196. |
| M4/M16 Magazine pouch | " █████████████████████████ ████████ AR 196. |
| Flashlight pouch | ███████████████████████████ AR 197. |
| Tourniquet pouch | " ██████████████████████████ " AR 197. |
| Single pistol mag pouch for Sig P320 Magazines | " ████████████████████████ █████ " AR 197. |

The Agency's evaluation stated Point Blank's product failed to meet these ten requirements, yet evidence of those features is included in the AR. As such, the Agency's evaluation chart is demonstrably incorrect, and calls into question the adequacy and thoroughness of the entire evaluation.

The multiple errors in the Agency's technical evaluation are not harmless. They demonstrate the Agency disparately treated offerors by waiving certain requirements for ADS/TYR, giving ADS/TYR credit for requirements it did not meet, and withholding credit from Point Blank for requirements it did meet. This Court has sustained protests on precisely these grounds. *See, e.g., BayFirst Solutions, LLC v. United States,* 102 Fed.Cl. 677, 686 (2012) (finding an agency acted unreasonably when it assessed a strength to the awardee but did not assess a similar strength for similar facts to the protestor); *see also Hunt*, 61 Fed. Cl. at 274 (finding an agency acted unreasonably when treating offerors disparately (*i.e.*, by relaxing a material requirement for only one offeror)).

Based on the AR, Point Blank's product met all of the Agency's material requirements, and ADS/TYR's product did not. Even assuming, *arguendo*, that Point Blank did not meet all of the Agency's requirements, the only reasonable determination based on the AR would have been that neither Point Blank nor ADS/TYR offered a solution that met all of the Agency's requirements. In either case, the Agency's decision to issue a sole source contract to ADS/TYR was irrational and harmed Point Blank by unreasonably eliminating it from consideration without providing an opportunity for fair and open competition.

### G.     Point Blank Is Entitled To Injunctive Relief

As detailed above and in Point Blank's MJAR, Point Blank has succeeded on the merits of its protest based on any number of the Agency's various procurement violations. Moreover, Point Blank is entitled to injunctive relief because continued performance of the BPA and task orders would irreparably harm Point Blank and the balance of the hardships and public interest weigh in favor of an injunction.

#### 1.     The Harm To Point Blank Is Not Solely Economic

Although part of the harm to Point Blank certainly is economic, Point Blank's harm is not based on economic harm alone. Moreover, this court repeatedly has held "lost potential profits of bid protesters cannot be recovered in an action at law and thus, by their very nature, constitute irreparable injury." *MORI Assocs., Inc. v. United. States*, 102 Fed. Cl. 503, 552–53 (2011) ("The Court concludes it is well-established that the potential profits that are lost to offerors when arbitrary procurement actions would deprive them of the opportunity to compete for a contract will normally be sufficient to constitute irreparable injury"); *Remington Arms Co., LLC v. United States*, 126 Fed. Cl. 218, 232–33 (2016) (recognizing "courts have found that the 'loss of

potential work and profits from a government contract constitutes irreparable harm.'"); *Hosp.*
*Klean of Tex., Inc. v. United States*, 65 Fed. Cl. 618, 624 (2005) ("[L]oss of profit, stemming
from a lost opportunity to compete for a contract on a level playing field has been found
sufficient to constitute irreparable harm."). Thus, quantifying Point Blank's exact economic
damages is inconsequential here, where Point Blank's first basis for irreparable harm is well-
established and is not solely economic.

Defendants' claim that Point Blank's non-economic harm (*e.g.*, the ability to serve its
customers) was self-inflicted is belied by the record. With respect to the ICE requirement, it is
undisputed that the Agency relied on the FBI Report (the substance of which was available only
to TYR) to create the RFI. The Agency also specifically sought ████████████████████,
included multiple unnecessary requirements to limit competition only to TYR, included unstated
testing standards (and ignored Point Blank's related request for additional information), and did
not allow any offerors (other than TYR) enough time to have their products tested. Then, the
Agency waived material requirements for TYR, unreasonably evaluated Point Blank's product,
and ultimately decided that only TYR could meet its requirement. The Agency's argument that
this was self-inflicted by Point Blank is specious.

The Agency then tries to further justify withholding the "FBI benchmark standards"
(which, as discussed in Section II.E.1., above, apparently refer to TYR's proprietary product) by
speculating that Point Blank could have obtained them from the FBI in October 2022. First, this
ignores that the FBI withheld material information about the existence of the skipping hazard
from everyone except for TYR (including other law enforcement agencies) for a minimum of
two years. Moreover, as discussed in detail above, regarding the FBI's offer of a virtual meeting,

Point Blank simply asked for information it could review in advance to ensure the conversation would be meaningful. Not only did the FBI opt not to provide Point Blank with any materials, it stopped responding to Point Blank altogether. Here again, this harm was not self-inflicted.

**2.     The Balance Of The Hardships And The Public Interest Weigh In Favor Of An Injunction**

To demonstrate harm, Defendants rely on the contention that ICE will run out of body armor by the end of September 2023. There are multiple vendors of body armor, so the fact that ICE should be enjoined from using this illegal procurement vehicle to order armor does not preclude it from fulfilling its reasonable needs. In fact, the U.S. Capitol Police procurement demonstrates how quickly vests can be obtained that defeat the skipping hazard when the procurement is done consistent with well-established procurement law and regulations. The delays here are a direct result of the Agency's own failures, and any such harm should not prevent issuance of an injunction. *See CW Gov't Travel, Inc. v. United States*, 154 Fed. Cl. 721, 751 (2021) (explaining that the government cannot contend the costs stemming from its own failures to follow the FAR, which was detrimental to the plaintiff's ability to meaningfully compete for the contract, should prevent the issuance of an injunction); *see also Green Tech. Grp., LLC v. United States*, 147 Fed. Cl. 231, 246 (2020) (explaining, "the resources needed to conduct a proper procurement are only those that should have been employed originally by the Agency. Having to employ these resources again is not a hardship, but an obligation.").

Finally, regarding the public interest, the Agency suggests that the Agency has an interest in being able to conduct a procurement "without excessive judicial interference" and then relies solely on its harm declarations as to why the Agency would be harmed by a delay in procuring

-25-

additional body armor. ECF 50 at 48-47. However, as exemplified by the recent U.S. Capitol Police solicitation, ICE could have issued a competitive solicitation for armor that defeats the skipping hazard (with clear requirements and enough time for adequate testing in an accredited facility) and then properly made an award. *See* ECF 48-5, Foreman Decl. ¶¶ 4-9. Thus, compliance with the law does not compromise officer safety, even though the procurement regulations prohibit ICE from issuing a sole source contract to ADS/TYR. As demonstrated by the U.S. Capitol Police procurement, the Agency can procure armor tested and validated to be effective, and can procure this armor quickly.

## III.   CONCLUSION

For the reasons in its MJAR and above, Point Blank has succeeded on the merits of its protest and is entitled to injunctive relief. Accordingly, Point Blank respectfully requests that the Court deny Defendants' cross motion for judgment on the AR, grant Point Blank judgment on the AR, and issue a permanent injunction in favor of Point Blank.

Respectfully submitted,

Dated: August 21, 2023

/s/ Ryan E. Roberts

Ryan E. Roberts
SHEPPARD MULLIN RICHTER & HAMPTON LLP
2099 Pennsylvania Avenue, NW
Suite 100
Washington, DC 20006
(202) 747-2187
reroberts@sheppardmullin.com
*Attorney of Record*

-26-

*Of counsel:*
Anne B. Perry
Nikole R. Snyder
Lillia J. Damalouji
SHEPPARD MULLIN RICHTER & HAMPTON LLP

*Attorneys for Point Blank Enterprises, Inc.*